TREG R. TAYLOR
ATTORNEY GENERAL

Aisha Tinker Bray
Assistant Attorney General
Office of the Attorney General
100 Cushman Street, Suite 400
Fairbanks, Alaska 99701
Telephone: (907) 451-2811
aisha.bray@alaska.gov

Attorney for State of Alaska, Elondre Johnson,
Nathaniel Johnson, James Thomas, & Christine Joslin

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

KYLE EYRE, as Personal Representative )
of the ESTATE OF CODY EYRE, )
           )
   Plaintiff, )
           )
   v. )
           )
THE CITY OF FAIRBANKS, a municipal )
corporation, RICHARD SWEET, TYLER )
LARIMER, THE STATE OF ALASKA, )
ELONDRE JOHNSON, NATHANIEL )
JOHNSON, JAMES THOMAS, III, )
CHRISTINE JOSLIN, and )
JOHN DOES 1-10, )
           )
   Defendants. )
_____ )   Case No. 4:19-cv-00038-SLG

**MEMORANDUM IN SUPPORT OF
STATE'S MOTION FOR SUMMARY JUDGMENT**

Defendants State of Alaska, Trooper Elondre Johnson, Trooper Nathaniel Johnson,

Trooper James Thomas, III, and Trooper Christine Joslin are entitled to summary

judgment on and dismissal of all of plaintiff the Estate of Cody Eyre's claims against them in this litigation. Troopers Elondre Johnson, Nathaniel Johnson, James Thomas, III, and Christine Joslin are each entitled to qualified immunity on the Estate's excessive force claims against them, and the Estate's remaining Americans with Disabilities Act and Rehabilitation Act claims against the State of Alaska fail as a matter of law.

## Standard of Review

Federal Rule of Civil Procedure 56 empowers this Court to enter summary judgment on factually unsupported claims, and thereby "secure the just, speedy and inexpensive determination of every action." *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986). "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323 (quoting Fed. R. Civ. P. 56). If the issue is one on which the nonmoving party must bear the burden of proof at trial, the moving party need only point out an absence of evidence supporting the claim; it does not need to disprove its opponent's claim. *Id*. at 325.

Once the moving party meets its initial responsibility, the burden then shifts to the non-moving party to go beyond the pleadings and designate specific materials in the

*Eyre v. City of Fairbanks, et al.*                                    Case No. 4:19-cv-00038-SLG
Memorandum in Support of State's Motion for Summary Judgment          Page 2 of 49

Case 4:19-cv-00038-SLG   Document 79   Filed 04/27/22   Page 2 of 49

record to show that there is a genuinely disputed material fact.  *Id*. at 324; Fed. R. Civ. P. 56.  A material fact affects the outcome of the case.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A "genuine issue" for trial exists if the non-moving party presents evidence from which a reasonable jury, viewing the evidence in the light most favorable to that party, could resolve the material issue in its favor.  *Id.* at 248-49.  All reasonable inferences that may be drawn from the evidence should be drawn in favor of the non-moving party.  *Id.* at 255.  The non-moving party, however, cannot simply rest on its allegations without offering significant probative evidence tending to support the complaint.  *U.A. Local 343 v. Nor-Cal Plumbing, Inc.*, 48 F.3d 1465, 1471 (9th Cir. 1994).  The mere suggestion that facts are in controversy, as well as conclusory or speculative testimony in affidavits and moving papers, is not sufficient to defeat summary judgment.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts."  *Id*.; *Thornhill Publ'g Co. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979).  Instead, the non-moving party must come forward with significant admissible evidence to satisfy the burden.  Fed. R. Civ. P. 56.

Additionally, the court must carefully examine all the evidence in the record, such as audio and video recordings of the incident, contemporaneous statements by the officers involved and others present at the scene, and available physical evidence.  *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994).  And, where, as here, the record includes a video, the court "should . . . view[] the facts in the light depicted by the videotape."  *Scott*

*Eyre v. City of Fairbanks, et al.*                                      Case No. 4:19-cv-00038-SLG
Memorandum in Support of State's Motion for Summary Judgment          Page 3 of 49

Case 4:19-cv-00038-SLG   Document 79   Filed 04/27/22   Page 3 of 49

*v. Harris*, 550 U.S. 372, 380-81 (2007). When audios and videos capture the events in question, no genuine dispute of fact exists for anything that is clearly discernable in an audiotape or a videotape of the events at issue. *Id*.

## Factual Background

On the evening of December 23, 2017, Cody Eyre broke up with his girlfriend.[1] The next evening, on December 24, 2017, Cody opened a live-feed on Facebook Live of him at home drinking with a loaded gun saying that he was going to kill himself.[2] Not too long thereafter, Cody left his house and his mother called 911 asking the Alaska State Troopers to come pick him up.[3] At that time, he was walking southbound along Farmer's Loop Road on the sidewalk towards Sourdough Fuel at the intersection of Farmer's Loop Road and the Steese Highway.[4] His mother, who was following him in her car, informed Dispatch that Cody had been drinking, was "really drunk," and had a gun with him in a holster.[5] She did not know whether the gun was loaded.[6] At one point, Cody's sister got out of the car and tried to talk to him, but he told her, "Get the fuck away from me right now."[7]

---

[1] Exhibits A at 2:20, 9:16 & K at 23:16-17 & 31:7-14.

[2] Exhibits A at 16:6-11, 17:8-13; F at 3; R; Z at 8:14-15; & AB at 9:13-15.

[3] Exhibit A at 2:22 & Exhibit AB at 16:24-17:1 & 17:13-15.

[4] Exhibits A at 2-3 & B at 1.

[5] Exhibits A at 2-3, 12:4-5 & B at 1.

[6] Exhibit A at 3 & 7.

[7] Exhibit A at 8.

*Eyre v. City of Fairbanks, et al.*                    Case No. 4:19-cv-00038-SLG
Memorandum in Support of State's Motion for Summary Judgment          Page 4 of 49

Case 4:19-cv-00038-SLG   Document 79   Filed 04/27/22   Page 4 of 49

Cody then entered the Steese Highway corridor on foot, walking southbound in the northbound lane of traffic.[8] He was clearly agitated, screaming, and yelling.[9] Officers could hear him screaming and yelling something like "F you" while he was running and walking down the Steese Highway as they were blocking the northbound traffic lanes.[10] At one point, Cody crossed over to the southbound traffic lanes and pulled the gun out of its holster, brandishing it at the officers and holding it to his own head.[11] Cody refused to put the gun down and continued walking toward the Johansen-Steese intersection, which is a very busy intersection.[12]

At the intersection, Cody headed east down City Lights Boulevard on to the side road behind the churches towards a residential neighborhood.[13] Cody repeatedly yelled at the officers to "Shut the fuck up" and growled at them while they backed off.[14] Officer Sweet warned, "Cody, you cannot go into that residential area" that was directly behind them.[15] Cody yelled at the officers, "You fucking stop. I'm not going to shoot you. Do you fucking understand?"[16] The officers implored Cody, "Put the gun down,"

---

[8] Exhibits A at 12-14; B at 3; & Z at 38:2-6.

[9] Exhibit B at 5.

[10] Exhibit B at 4.

[11] Exhibits B at 5-7 & Z at 38:2-6, 42:5-6, & 43:8-12.

[12] Exhibits B at 7 & Z at 44:1-8 & 45:12-15.

[13] Exhibits B at 7-8; J at 36; D at 1; L; M; N; & Z at 45:18-25, 47:22-48:2, & 49:4-6.

[14] Exhibits B at 2; C at 6; & L.

[15] Exhibits B at 6; C at 4; & L.

[16] Exhibit C at 1.

*Eyre v. City of Fairbanks, et al.*                                      Case No. 4:19-cv-00038-SLG
Memorandum in Support of State's Motion for Summary Judgment          Page 5 of 49

Case 4:19-cv-00038-SLG   Document 79   Filed 04/27/22   Page 5 of 49

"Just drop the gun," "Just set it down," and "Drop the gun."[17] Cody continued to yell and growl at the officers while refusing to put the gun down, and insisting he was going to kill himself.[18]

Cody then stopped walking, pausing about 200 yards from the residential area.[19] He knelt down and put the gun in his mouth.[20] Suddenly, Cody screamed, "You guys can fucking die right now and I don't give a fuck" and deliberately pointed his gun directly at the officers.[21] The officers immediately fired.[22] However, Cody continued moving with the gun in his hand, turning to his right.[23] Thus, with a continuing threat, the officers fired again.[24] Cody later died as a result of multiple gunshots wounds sustained in his standoff with police officers.[25]

On December 2, 2019, the Estate of Cody Eyre ("the Estate") sued the State of Alaska and individual state defendants Troopers Elondre Johnson, Nathaniel Johnson, James Thomas, III, and Christine Joslin as well as the City of Fairbanks and Fairbanks

---

[17] Exhibit C at 4-7.

[18] Exhibits C at 2-6 & D at 2-6.

[19] Exhibit C at 8.

[20] Exhibit Z at 68:10-11.

[21] Exhibits C at 8; D at 6; F at 15-16; & Z at 68:13-18.

[22] Exhibits C at 8; D at 6; & F at 18.

[23] Exhibits F at 18 & J at 23-24.

[24] Exhibits F at 20 & J at 23-24.

[25] Complaint (DE#1).

*Eyre v. City of Fairbanks, et al.*                    Case No. 4:19-cv-00038-SLG
Memorandum in Support of State's Motion for Summary Judgment          Page 6 of 49

Case 4:19-cv-00038-SLG   Document 79   Filed 04/27/22   Page 6 of 49

Police Officers Richard Sweet and Tyler Larimer for the death of Mr. Eyre.[26]  In its first

cause of action, the Estate asserted state common law negligence claims for wrongful

death [AS 09.50.580] and survivorship [AS 09.50.570].[27]  Second, the Estate brought a

state law negligent failure to train and supervise claim against the State of Alaska and the

City of Fairbanks.[28]  Third, the Estate alleged that defendants violated Mr. Eyre's civil

rights under 42 U.S.C. §1983 through the use of excessive and unreasonable force.[29]  In

its fourth and fifth causes of action, the Estate asserted that the State of Alaska and the

City of Fairbanks violated the Americans with Disabilities Act by failing to accommodate

Mr. Eyre's mental illness and by failing to train their officers to make reasonable

accommodations for mental health disabilities.[30]  Sixth, the Estate claimed that the State

of Alaska and the City of Fairbanks violated the Rehabilitation Act, 29 U.S.C. § 794(a),

by denying Mr. Eyre benefits, discriminating against him on the basis of his disability,

and failing to reasonably accommodate his disability.[31]  For its seventh and eighth causes

of action, the Estate asserted state law wrongful death claims against the individual

defendants directly and against the State of Alaska and the City of Fairbanks as

---

[26] *Id.*

[27] *Id.* at 9-10 ¶¶41-44.

[28] *Id.* at 10-11 ¶¶45-50.

[29] *Id.* at 11 ¶53.

[30] *Id.* at 11-13 ¶¶54-64.

[31] *Id.* at 13-14 ¶¶ 65-69.

*Eyre v. City of Fairbanks, et al.*                                    Case No. 4:19-cv-00038-SLG
Memorandum in Support of State's Motion for Summary Judgment          Page 7 of 49

Case 4:19-cv-00038-SLG   Document 79   Filed 04/27/22   Page 7 of 49

vicariously liable for the conduct of their respective officers.[32]  Finally, for its ninth

claim, the Estate cursorily asserted that each of the individual defendants committed

assault and battery.[33]

On June 19, 2020, this Court dismissed all of the Estate's state law claims and its

42 U.S.C. §1983 claim against the State of Alaska based on the State of Alaska's

sovereign immunity, leaving only the Americans with Disabilities Act and Rehabilitation

Act claims against the State of Alaska.[34]  However, all of the Estate's remaining claims

fail as a matter of law.

## Discussion

## Part I - Federal Law Civil Rights Claims under 42 U.S.C. §1983

In relevant part, 42 U.S.C. §1983 provides,

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. §1983.  However, §1983 "is not itself a source of substantive rights," but rather

a method of vindicating federal rights conferred elsewhere.  *Graham v. Connor*, 490 U.S.

386, 393-94 (1989) (quotation omitted).  To maintain an action under §1983, a plaintiff

---

[32]  *Id*. at 14-16 ¶¶70-81.

[33]  *Id*. at 16 ¶82.

[34]  Order Re State of Alaska's Motion to Dismiss (DE#40).

Case No. 4:19-cv-00038-SLG

must show: (1) that the conduct complained of was committed by a person acting under color of state law, and (2) that the conduct deprived plaintiff of a federal constitutional or statutory right. *Leer v Murphy*, 844 F.2d 628, 632-33 (9th Cir. 1988) (citations omitted).

Where a plaintiff pleads a valid cause of action under 42 U.S.C. §1983, government officials sued in their individual capacities may raise the affirmative defense of qualified immunity. *Mullenix v. Luma*, 136 S.Ct. 305, 308 (2015). Qualified immunity "balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly, and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). Qualified immunity offers complete protection for government officials sued in their individual capacities, so long as their conduct violates no clearly established statutory or constitutional rights of which a reasonable person would have known. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "The principles of qualified immunity shield an officer from personal liability when an officer reasonably believes that his or her conduct complies with the law." *Pearson*, 555 U.S. at 244.

"[Q]ualified immunity [also] shields an officer from suit when she makes a decision that, even if constitutionally deficient, reasonably misapprehends the law governing the circumstances she confronted." *Brosseau v. Haugen*, 543 U.S. 194 (2004). The protection of qualified immunity applies regardless of whether the officer's error is a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact.

*Eyre v. City of Fairbanks, et al.*        Case No. 4:19-cv-00038-SLG
Memorandum in Support of State's Motion for Summary Judgment     Page 9 of 49

Case 4:19-cv-00038-SLG    Document 79    Filed 04/27/22    Page 9 of 49

*Butz v. Economou*, 438 U.S. 478, 507 (1978). "[U]nder both Alaska and federal law, 'qualified immunity can be conferred when an officer could have reasonably believed that his conduct was lawful (even if it was not).'" *Maness v. Daily*, 307 P.3d 894, 901 (Alaska 2013) (quoting *Sheldon v. City of Ambler*, 178 P.2d 459, 464 (Alaska 2008)). In other words, qualified immunity operates to protect officers from the sometimes "hazy border between excessive and acceptable force." *Saucier v. Katz*, 533 U.S. 194, 206 (2001).

Qualified immunity is not merely a defense on the merits. *Id*. at 200-01. It is immunity from suit. *Id*. Qualified immunity is an entitlement not to stand trial. *Id*. It is broad and operates to protect all but the plainly incompetent or those who knowingly violate the law. *Hunter v. Bryant*, 502 U.S. 224, 227 (1991); *Malley v. Briggs*, 475 U.S. 335, 341 (1986). An officer forfeits qualified immunity only if he violates a federal constitutional right that is clearly established at the time of his actions. *Sweaney v. Ada County, Idaho*, 119 F.3d 1385, 1391 (9th Cir. 1997). The burden is on the plaintiff, however, to establish that the right the official allegedly violated was clearly established at the time of the conduct at issue. *Hunter*, 502 U.S. at 233; *Davis v. Scherer*, 468 U.S. 183, 193-97 (1984); *Sorrells v. McKee*, 290 F.3d 965, 969 (9th Cir. 2002).

Whether qualified immunity applies to a particular case requires a two-pronged analysis. *Saucier*, 533 U.S. at 205-07. First, the court must examine whether an officer's conduct violated a constitutional right. *Id*. at 200-01. If there is no constitutional violation, the inquiry ends and the officer is entitled to qualified immunity. *Id*. at 201.

Case 4:19-cv-00038-SLG   Document 79   Filed 04/27/22   Page 10 of 49

Second, if a constitutional violation is found, the court must analyze whether the law in effect at the time of the alleged conduct gave the officer warning that the officer's particular conduct was unconstitutional. *Id*. at 201-01; *Hope v. Pelzer*, 536 U.S. 730, 731 (2002). "The relevant inquiry is whether existing precedent placed the conclusion that [the officer] acted unreasonably in these circumstances 'beyond debate.'" *Mullenix v. Luna*, 136 S.Ct. 305, 309 (2015). If the law is not clearly established as to be beyond debate, qualified immunity attaches since the officer was not on notice that the conduct was clearly unlawful. *Saucier*, 533 U.S. at 202. "The dispositive question is 'whether the violative nature of *particular* conduct is clearly established.'" *Mullenix*, 136 S.Ct. at 308 (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011)). Courts may "exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson*, 555 U.S. at 236.

### A. The individual officers were justified in their use of force and did not violate Mr. Eyre's constitutional rights.

Under the rubric of a 42 U.S.C. §1983 claim, the Estate alleges that the individual officers each violated decedent Cody Eyre's rights under the United States Constitution through the use of unreasonable and excessive force resulting in his death.[35]

There is no "generic" standard for §1983 excessive force claims. *Graham v. Connor*, 490 U.S. 386, 393 (1989). Rather, allegations of physically abusive government

---

[35] Complaint (DE#1) at 11 ¶53.

Case 4:19-cv-00038-SLG   Document 79   Filed 04/27/22   Page 11 of 49

conduct or excessive force are better evaluated under the protections of the Fourth Amendment. *Id*. at 394-95. Thus, "*all* claims that law enforcement officers have used excessive force . . . should be analyzed under the Fourth Amendment and its 'reasonableness' standard, rather than under a 'substantive due process' approach." *Id*. at 395.

Under the Fourth Amendment, "[t]he right of the people to be secure in their persons, house, papers, and effects, against unreasonable searches and seizures, shall not be violated and no Warrants shall issue, but upon probable cause." U.S. Const. amend. IV. A seizure is a "governmental termination of freedom of movement through means intentionally applied." *Jensen v. City of Oxnard*, 145 F.3d 1978, 1083 (9th Cir. 1998) (internal quotations omitted). A seizure occurs "whenever [an officer] restrains the individual's freedom to walk away." *Robins v. Harum*, 773 F.2d 1004, 1009 (9th Cir. 1985). As such, an intentional shooting by an officer constitutes a seizure for purpose of the Fourth Amendment. *Jensen*, 145 F.3d at 1078.[36]

However, "[t]he Fourth Amendment does not proscribe all state-initiated searches and seizure; it merely proscribes those which are unreasonable." *Florida v. Jimeno*, 500 U.S. 248, 250 (1991). It requires officers making an arrest to use only an amount of force that is objectively reasonable in light of the circumstances facing them. *Tennessee v. Garner*, 471 U.S. 1, 7-8 (1985). "To determine if a Fourth Amendment violation has

---

[36] *See also Wilkinson v. Torres*, 610 F.3d 546, 550 (9th Cir. 2010) ("Apprehension by deadly force is a seizure subject to the Fourth Amendment's reasonableness requirements.").

*Eyre v. City of Fairbanks, et al.*                                    Case No. 4:19-cv-00038-SLG
Memorandum in Support of State's Motion for Summary Judgment          Page 12 of 49

Case 4:19-cv-00038-SLG   Document 79   Filed 04/27/22   Page 12 of 49

occurred, [the court] must balance the extent of the intrusion in the individual's Fourth Amendment rights against the government's interest to determine whether the officer's conduct was objectively reasonable based on the totality of the circumstances." *Espinosa v. City and County of San Francisco*, 598 F.3d 528, 537 (9th Cir. 2010) (citing *Graham*, 490 U.S. at 396-397).

A court must "assess the quantum of force used to arrest [the plaintiff] by considering 'the type and amount of force inflicted.'" *Drummond el rel. Drummond v. City of Anaheim*, 343 F.3d 1052, 1056 (9th Cir. 2003) (quoting *Deorle v. Rutherford*, 272 F.3d 1272, 1279 (9th Cir. 2001)). "The use of deadly force implicates the highest level of Fourth Amendment interests both because the suspect has a 'fundamental interest in his own life' and because such force 'frustrates the interest of the individual, and of society, in judicial determination of guilt and punishment." *A.K.H. ex rel Landeros v. City of Tustin*, 837 F.3d 1005, 1011 (9th Cir. 2016) (quoting *Garner*, 471 U.S. at 9). Since no one disputes that some of the officers used the highest level of force against Mr. Eyre,[37] the question in determining whether their use of force was objectively reasonable is whether the government's countervailing interests at stake were sufficient to justify their use of deadly force. *Graham*, 490 U.S. at 396.

---

[37] Trooper Nathaniel Johnson did not personally use deadly force against Mr. Eyre. Exhibit E at 16:6 ("So I didn't fire.") & Exhibit Z at 69:12 ("No. I did not.). The highest level of force employed by Trooper Nathaniel Johnson was the threat of deadly force. However, as explained herein, since his fellow officers' use of deadly force was objectively reasonable, Trooper Nathaniel Johnson's use of less force was also reasonable under the circumstances of this case.

*Eyre v. City of Fairbanks, et al.*  Case No. 4:19-cv-00038-SLG
Memorandum in Support of State's Motion for Summary Judgment  Page 13 of 49

Case 4:19-cv-00038-SLG  Document 79  Filed 04/27/22  Page 13 of 49

The strength of the government's interests is measured by examining three primary factors with regard to a particular use of force: "(1) the severity of the crime at issue; (2) whether the suspect poses an immediate threat to the safety of the officers or others; and (3) whether the suspect actively resists detention or attempts to escape." *Liston v. County of Riverside*, 120 F.3d 965, 976 (9th Cir. 1997) (citing *Graham*, 490 U.S. at 388). "Other relevant factors include the availability of less intrusive alternatives to the force employed, whether the proper warnings were given[,] and whether it should have been apparent to officers that the person they used force against was emotionally disturbed." *Glenn*, 673 F.3d at 872. "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396. "The calculus of reasonableness must embody allowances for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving— about the amount of force that is necessary in a particular situation." *Id*. And, although the question is highly fact specific, the inquiry is objective. *Wilkinson v. Torres*, 610 F.3d 546, 550 (9th Cir. 2010). A court must ask "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them." *Id*. (citations omitted). And "broad discretion . . . must be afforded to police officers who face a tense situation" and courts should defer "to the judgment of reasonable officers on the scene." *Jeffers v. Gomez*, 267 F.3d 895, 909 (9th Cir. 2001). As explained below, these factors clearly demonstrate that the government's interests in this case were

*Eyre v. City of Fairbanks, et al.*                                    Case No. 4:19-cv-00038-SLG
Memorandum in Support of State's Motion for Summary Judgment          Page 14 of 49

Case 4:19-cv-00038-SLG   Document 79   Filed 04/27/22   Page 14 of 49

sufficient to justify the use of deadly force and the officers' use of such force was objectively reasonable in light of the facts and circumstances confronting them at the time such force was used.

First, the officers were responding to a report of an highly intoxicated, suicidal, armed individual who refused to communicate or cooperate with his family or law enforcement.[38] Mr. Eyre's actions—waiving a loaded firearm around while drunk[39] and screaming and growling at officers[40]—constituted the criminal offense of misconduct involving a weapon and presented a definite hazard to the public that the officers could not ignore.[41] He also committed assault in the third degree by placing others around him in fear of imminent serious physical injury.[42] Although Mr. Eyre had not threatened anyone but himself before he first encountered the officers, he was intoxicated and continually escalating. He told sister, who was following him with his mother in a car to "[g]et the fuck away from me right now."[43] He yelled, screamed, and growled at officers who tried to talk to him to calm him down.[44] At some point, he unholstered his gun,

---

[38] Exhibits A at 2:19-22, 4:21, 8:19-20, 12:4-5, 16:8, & 17:8-9; & E at 9.

[39] Exhibits AA at 23:1-4 ("He was intoxicated. I know I smelled the alcohol when he passed [me]."); & Y at 28:22-25.

[40] Exhibits B 4-7; C at 1-2 & 7-8; E at 11 &14-15; & R.

[41] Exhibits Z at 60:12-20 & AA at 17:13-22. *See* AS 11.61.210(a)(1), Misconduct involving a weapon in the fourth degree & AS 11.61.220(a)(1), Misconduct involving a weapon in the fifth degree.

[42] Exhibits Z at 60:10-12. *See* AS 11.41.220(1)(A), Assault in the third degree.

[43] Exhibit A at 8:19-20.

[44] Exhibits B at 4 & C at 4-5.

*Eyre v. City of Fairbanks, et al.*                     Case No. 4:19-cv-00038-SLG
Memorandum in Support of State's Motion for Summary Judgment          Page 15 of 49

Case 4:19-cv-00038-SLG   Document 79   Filed 04/27/22   Page 15 of 49

brandished it about, and pointed it at his head and briefly the officers.[45]  All of this

occurred while Mr. Eyre was intoxicated and near a very busy intersection and a

residential area where there is a lot of traffic, potentially endangering the public.[46]  There

was a serious risk that he would go from suicidal to homicidal in his highly intoxicated

and agitated state.  Ultimately, he specifically threatened the officers' lives moments

before pointing his loaded gun directly at them.[47]  Mr. Eyre yelled, "You guys can

fucking die right now and I don't give a fuck."[48]  Thus, the crimes that he committed

included misconduct involving a weapon, assault in the third degree, and attempted

murder.[49]  As such, the severity of the crimes at issue is high.

Second, Mr. Eyre actively refused the officers pleas to cooperate before fatally

pointing his gun directly at them.  The officers repeatedly tried to calm him down and

talk him into dropping his gun to no avail.[50]  Troopers Elondre Johnson and Nathaniel

Johnson, repeatedly asked Mr. Eyre to "Drop the gun."[51]  Trooper Nathaniel Johnson

implored Mr. Eyre "Drop the gun, Cody, c'mon.  Just put the gun down."[52]  He tried to

---

[45]  Exhibits B at 6 & Z at 68:3-8.

[46]   Exhibits Z at 68:17-20 & AA at 40:12-21 & 42:24-43:6.

[47]  Exhibit E at 15-16.  *See* Exhibit R.

[48]  Exhibits C at 8 & D at 6.  *See* Exhibit Y at 47:10-12; Exhibit AA at 21:7-8.

[49]  *See* AS 11.41.100 & AS 11.31.100.

[50]  Exhibits C at 1-7 & D at 2-4.

[51]  Exhibit C at 1-4.

[52]  Exhibit C at 4.  *See also* Exhibit Z at 58:23-25.

*Eyre v. City of Fairbanks, et al.*                                    Case No. 4:19-cv-00038-SLG
Memorandum in Support of State's Motion for Summary Judgment          Page 16 of 49

connect with Mr. Eyre through their shared military service.[53]  The officers offered to get

help for him and get him someone to talk to, but their efforts were rebuffed with more

profanity and growling.[54]  Mr. Eyre's ultimate response was "You guys can fucking die

right now and I don't give a fuck."[55]  Unfortunately, Mr. Eyre resisted all offers and

efforts to get him to peacefully put the gun down.  This encounter would have ended

instantly and peacefully had Mr. Eyre simply placed his weapon on the ground and

backed away.  Rather, Mr. Eyre yelled, cursed, growled, and waived the handgun around

before deliberately and intentionally pointing it directly at the officers.[56]

Third, the most important element in an excessive force claim is whether the

suspect posed an immediate threat to the safety of the officers or others. *Blankenhorn v.

City of Orange*, 485 F.3d 463, 477 (9th Cir. 2007) (quoting *Graham*, 490 U.S. at 396);

*Chew v. Gates*, 27 F.3d 1432, 1441 (9th Cir. 1994).  "[W]hile [officers] are not entitled to

point their guns at citizens when there is no hint of danger, they are allowed to do so

when there *is* reason to fear danger."  *Baird v. Renbarger*, 601 F.3d 340, 346 (7th Cir.

2009).[57]  "Law enforcement may not shoot to kill unless, at a minimum, the suspect

---

[53]  *Id*.

[54]  Exhibits C at 6 & AA at 44:2-7.

[55]  Exhibits C at 8 & D at 6.

[56]  Exhibit Z at 68:10-18.

[57]  *See e.g. Mejia v. County of San Bernadino*, 2010 WL 11597873 *2 (C.D. Cal. 2010)
("[I]f there is a valid law enforcement purpose for the use of a firearm, and the firearm is
used in a manner that is reasonably proportional to the valid law enforcement purpose,
then there is no constitutional violation.").

*Eyre v. City of Fairbanks, et al.*                    Case No. 4:19-cv-00038-SLG
Memorandum in Support of State's Motion for Summary Judgment          Page 17 of 49

Case 4:19-cv-00038-SLG   Document 79   Filed 04/27/22   Page 17 of 49

presents an immediate threat to the officer or others, or is fleeing and his escape will result in serious threat of injury to persons." *Harris v. Roderick*, 126 F.3d 1189, 1201 (9th Cir. 1999). In other words, where an officer has "probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others," the officer may constitutionally threaten to use and use deadly force. *Wilkinson*, 610 F.3d at 550 (citing *Garner*, 471 U.S. at 11). Additionally, "the analysis must be whether the force was reasonable at the moment it was applied." *Graham*, 490 U.S. at 396.

The audios and videos from the incident along with the officers' statements reveal the basic irrefutable facts.[58] At the relevant time—when deadly force was applied— Mr. Eyre presented an immediate threat of injury or death to the officers at the scene. He was clearly intoxicated, unstable, and unpredictable.[59] Mr. Eyre threatened the officers, screaming at them, "You guys can fucking die right now and I don't give a fuck."[60] Officer Larimer had a clear sight picture on Mr. Eyre "holding the gun out directly down the road uh, towards myself."[61] As Trooper Thomas explained, Mr. Eyre "pointed the gun at us and, and I was just I was scared waiting for a mussel flash because it was a long—it was a long barrel revolver."[62] "It was like here it comes, he's going to shoot

---

[58]  Exhibits L, M, N, O, P, and Q.

[59]  Exhibits AA at 23:6 & AC at 37:22-23.

[60]  Exhibits C at 8 & D at 6.

[61]  Exhibit I at 14.

[62]  Exhibit F at 16.

*Eyre v. City of Fairbanks, et al.*                              Case No. 4:19-cv-00038-SLG
Memorandum in Support of State's Motion for Summary Judgment          Page 18 of 49

Case 4:19-cv-00038-SLG   Document 79   Filed 04/27/22   Page 18 of 49

us—."[63]  Trooper Elondre Johnson also stated, "I was absolutely in fear of just, you know, of just being shot or killed" and "I had at least four other people with me that I was concerned about getting shot at the same time, shot or killed." [64]  "I was terrified based upon his actions."[65]  Trooper Joslin stated, "Because the gun was pointed at us, and I thought he might shoot us and that he was going to kill somebody, or hurt somebody, one of us that was standing there."[66]  Mr. Eyre was clearly intoxicated and agitated and deliberately pointed his gun directly at the officers.[67]  There was also a danger to the public if Mr. Eyre started shooting near or in the nearby residential area, or if someone entered the area of the standoff from the churches or surrounding area.[68]  The officers repeatedly pleaded with Mr. Eyre to drop the gun.[69]  As Trooper Joslin described, "the Troopers that were with me and the FPD Officers did, they were asking him to stop, asking him to put the gun down" and his response was "a lot of profanity . . . telling [them] to go fuck [them]selves, said that he wasn't going to stop."[70]

Unfortunately, Mr. Eyre refused to listen to the officers' pleas.  Mr. Eyre moved purposefully and quickly when he pointed his loaded handgun directly toward the officers

---

[63]  *Id*. at 17.

[64]  Exhibit G at 15.

[65]  Exhibit AA at 50:2-3.

[66]  Exhibit H at 16.

[67]  *Id*.; Exhibits Y at 46-47; Z at 68:13-18; & AA at 21:8.

[68]  Exhibits H at 9; I at 7; & Z at 60:17-19 & 68:11-17.

[69]  Exhibits C & D.

[70]  Exhibit H at 7; Exhibits Y at 46:21-22; Z at 68:13-18; AA at 21:7-8.

*Eyre v. City of Fairbanks, et al.*                                   Case No. 4:19-cv-00038-SLG
Memorandum in Support of State's Motion for Summary Judgment          Page 19 of 49

Case 4:19-cv-00038-SLG   Document 79   Filed 04/27/22   Page 19 of 49

before he was fired upon.[71] He did not need to do so. And the officers knew if they did not shoot, he was going to shoot them.[72] The evidence clearly demonstrates that the officers did not resort to the use of deadly force until Mr. Eyre gave them no other choice by deliberately pointing his loaded firearm directly at them.[73]

Additionally, "[t]he Ninth Circuit has 'refused to create two tracks of excessive force analysis, one for the mentally ill and one for serious criminals.'" *Elifritz v. Fender*, 460 F.Supp.3d 1088, 1111 (D. Or. 2020) (quoting *Bryan v. MacPherson*, 630 F.3d 805, 829 (9th Cir. 2010)). "Just like any other relevant personal characteristic—height, strength, aggressiveness—a [person's] known or evident disability is part of the Fourth Amendment circumstantial calculus." *Bates v. Chesterfield Cty.*, 216 F.3d 367, 372 (4th Cir. 2000) The presence of an emotional disturbance does not reduce the governmental interest in using deadly force when officers confront a person who has committed serious offenses and presents an immediate threat of serious injury or death. *Elifritz*, 460 F.Supp.3d at 1111-12. "'Knowledge of a person's disability simply cannot foreclose officers from protecting themselves, the disabled person, and the general public.'" *City & Cnty of San Francisco, Cal. v. Sheehan*, 135 S.Ct. 1765, 1178 (*Sheehan II*) (quoting *Bates*, 216 F.3d at 372). Here, while the officers knew that Mr. Eyre was intoxicated and highly agitated, the officers did not have to endanger their own lives or the lives of their

---

[71] *See* Exhibits C, D, F, G, H, I, J, L, M, N, & R.

[72] *See* Exhibits F at 15-16 & 22-23; G at 15; H at 9, 16-17; I at 12; & J at 21.

[73] *See id.*; Exhibit Z at 67:16-68:18.

*Eyre v. City of Fairbanks, et al.*           Case No. 4:19-cv-00038-SLG
Memorandum in Support of State's Motion for Summary Judgment    Page 20 of 49

Case 4:19-cv-00038-SLG   Document 79   Filed 04/27/22   Page 20 of 49

fellow officers to allow Mr. Eyre to continue to his destination to commit suicide.[74]  At

all times, the officers have a responsibility to uphold the law and ensure public safety.

*Bates*, 216 F.3d at 372.

In sum, no one used excessive force on Mr. Eyre.  Weighing the force used against

the governmental interests at stake, Mr. Eyre was armed and dangerous, actively resisted

the officers' efforts to separate him from his gun, and posed a clear and immediate threat

to the safety of the officers at the scene at the time he was shot.  Each officers' response

to Mr. Eyre's specific actions on the evening of December 24, 2017 was objectively

reasonable.  No one violated Mr. Eyre's Fourth Amendment rights.  As such, each of the

officers is entitled to qualified immunity and dismissal of the Estate's §1983 claim

against them individually.

### B.      There was no violation of clearly established law.

In addition to there being no violation of Mr. Eyre's Fourth Amendment rights,

there is no violation of clearly established law, further and separately entitling each of the

officers to qualified immunity.

Clearly established law may not be defined at a high level of generality.  *Ashcroft*

*v. al-Kidd*, 563 U.S. 731, 742 (2011).  The inquiry is whether the law, at the time of the

incident in question, clearly established that the Fourth Amendment prohibited the

officer's conduct in the situation the officer confronted.  *Mullenix*, 136 S.Ct. at 309.

"Qualified immunity is no immunity at all if 'clearly established' law can simply be

---

[74]  *See* Exhibit AA at 22:20-21.

*Eyre v. City of Fairbanks, et al.*                                    Case No. 4:19-cv-00038-SLG
Memorandum in Support of State's Motion for Summary Judgment          Page 21 of 49

Case 4:19-cv-00038-SLG   Document 79   Filed 04/27/22   Page 21 of 49

defined as the right to be free from unreasonable searches and seizures." *Sheehan II*, 135 S.Ct. at 1176. "[T]he clearly established law must be 'particularized' to the facts of the case." *White v. Pauly*, 137 S.Ct. 548, 552 (2017) (citing *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). "Such specificity is especially important in the Fourth Amendment context, where the Supreme Court has recognized that it can be difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts." *Id.* (internal citations and quotations omitted). Although a case "directly on point" is not required, existing precedent must have placed the statutory or constitutional question beyond debate. *Ashcroft*, 563 U.S. at 741.

As discussed above, claims of excessive force by police officers are judged pursuant to the Fourth Amendment's reasonableness standard. *Graham*, 490 U.S. at 388. Officer are entitled to point their guns at citizens "when there *is* reason to fear danger." *Baird*, 601 F.3d at 346. Likewise, while it is unreasonable to "seize an unarmed nondangerous suspect by shooting him dead," "[w]here the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force." *Garner*, 471 U.S. at 11.

In this situation, the law is clearly established; it is beyond debate. It is well established that officers may use deadly force when confronted with deadly force against them. Also, an officer need not wait for the suspect to strike a blow before acting to ensure his safety and the safety of others. Nor does an officer have to be "'omniscien[t ],

*Eyre v. City of Fairbanks, et al.*                              Case No. 4:19-cv-00038-SLG
Memorandum in Support of State's Motion for Summary Judgment          Page 22 of 49

Case 4:19-cv-00038-SLG   Document 79   Filed 04/27/22   Page 22 of 49

and absolute certainty of harm need not precede [an officer's] act of self-protection."

*Wilkinson*, 610 F.3d at 553 (citation and internal question mark omitted). "[W]here a

suspect threatens an officer with a weapon such as a gun or a knife, the officer is justified

in using deadly force." *Smith v. City of Hemet*, 394 F.3d 689, 704 (9th Cir. 2005).[75]

"Nothing in the Fourth Amendment barred [the officers] from protecting themselves"

from an armed, obviously unstable, intoxicated person making threats, "even though it

meant firing multiple rounds." *Sheehan II*, 135 S.Ct. at 1775-76. In fact, even if the

officers misjudged the situation, there is no "Fourth Amendment violation based merely

on bad tactics that result in a deadly confrontation that could have been avoided." *Id*. at

1176. The officers' use of force is judged based on the plaintiff's acts.[76] As such, the

case law is clear and well established and supports the use of deadly force in the

circumstances of this case.[77]

---

[75] *See Long v. City and Cty. of Honolulu*, 511 F.3d 901, 905 (9th Cir. 2007) (suspect who raised a rifle and shouted threat posed immediate threat of serious injury or death); *Scott v. Henrich*, 39 F.3d 912, 914-15 (9th Cir. 1994) (use of deadly force is objectively reasonable where a suspect points a gun at officers); *Reynolds v. County of San Diego*, 84 F.3d 1162, 1168 (9th Cir. 1996) (holding deadly force reasonably when suspect, who was behaving erratically, swung knife at an officer); *George v. Morris*, 736 F.3d 829, 838 (9th Cir. 2013) ("If the person is armed . . [then] a furtive movement, harrowing gesture, or serious verbal threat might create an immediate threat."); and *Elliott v. Leavitt*, 99 F.3d 640, 642 (4th Cir. 1996) (immediately before shooting the suspect, the suspect pointed a handgun at officers with his finger on the trigger only a few feet away behind a car window).

[76] *See Hector v. Watt*, 235 F.3d 154, 160 (3rd Cir. 2001) ("[I]f the officers' use of force was reasonable given the plaintiff's acts, then despite the illegal entry, the plaintiff's own conduct would be an intervening cause.").

[77] *See In re Vent v. State of Alaska, et al.*, 2020 WL 1046816, *6 (D. Alaska March 3, 2020) ("It is well established that when an individual points his gun in the officers'

*Eyre v. City of Fairbanks, et al.*      Case No. 4:19-cv-00038-SLG
Memorandum in Support of State's Motion for Summary Judgment      Page 23 of 49

Case 4:19-cv-00038-SLG    Document 79    Filed 04/27/22    Page 23 of 49

Mr. Eyre was armed and dangerous. He actively resisted officers attempts to separate him from his gun. He made verbal threats of harm to the officers. He intentionally pointed his loaded gun directly at the officers. Mr. Eyre's final act with his handgun presented an immediate threat of harm to the officers at the scene. It was also coupled with Mr. Eyre's specific threat of harm to the officers. The officers used deadly force in self-defense and defense of others in direct response to Mr. Eyre's use deadly force. As such, the individual officers did not violate clearly established law in pointing their firearms at Mr. Eyre or in shooting him in response to his clear threat of harm. Each of the officers is entitled to qualified immunity and dismissal of the Estate's §1983 excessive force claim against them individually.

### C. All claims against Trooper Nathaniel Johnson fail as a matter of law.

A 42 U.S.C. §1983 claim against an individual officer is a claim that the named individual officer personally violated plaintiff's civil rights. As such, there must be an individualized analysis of each officer's alleged conduct—each use of force—to determine whether the factual allegations against each individual officer were sufficient to overcome the officer's qualified immunity. *Cunningham v. Gates*, 229 F.3d 1271, 1289 (9th Cir. 2000).[78]

---

direction, the Constitution undoubtedly entitles the officer to respond with deadly force.") (internal quotations omitted).

[78] *See Taylor v. Riojas*, 141 S.Ct. 52, 54 (2020) ("an officer-by-officer analysis will be necessary"); *Roberts v. City of Omaha*, 723 F.3d 966, 974 (11th Cir. 2013) (district court must conduct individualized analysis of each officer's alleged conduct).

*Eyre v. City of Fairbanks, et al.*                                    Case No. 4:19-cv-00038-SLG
Memorandum in Support of State's Motion for Summary Judgment          Page 24 of 49

Case 4:19-cv-00038-SLG   Document 79   Filed 04/27/22   Page 24 of 49

Trooper Nathaniel Johnson did not personally use deadly force against Mr. Eyre. As Trooper Nathaniel Johnson reported immediately after the incident, "So I didn't fire."[79] As he explained, "I'd already been out in the cold [] close to a half an hour" and "[m]y hands were extremely numb."[80] At his deposition Trooper Nathaniel Johnson again confirmed, "No. I did not" shoot.[81] Since Trooper Nathaniel Johnson did not fire a weapon at all, he did not fatally shoot Mr. Eyre. Trooper Nathaniel Johnson simply did *not* use deadly force against Mr. Eyre.

The highest level of force employed by Trooper Nathaniel Johnson was the threat of deadly force from pointing his gun at Mr. Eyre *after* Mr. Eyre first pointed his gun at the officers.[82] "[W]hile [officers] are not entitled to point their guns at citizens when there is no hint of danger, they are allowed to do so when there *is* reason to fear danger." *Baird*, 601 F.3d at 346.[83] In other words, where an officer has "probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others," the officer may constitutionally threaten to use . . . deadly force. *Wilkinson*, 610 F.3d at 550 (citing *Garner*, 471 U.S. at 11).

---

[79] Exhibit E at 16:6.

[80] *Id*. at 16:13-14 &

[81] Exhibit Z at 69:11-12.

[82] Exhibit Z at 60:3-8.

[83] *See e.g. Mejia v. County of San Bernadino*, 2010 WL 11597873 *2 (C.D. Cal. 2010) ("[I]f there is a valid law enforcement purpose for the use of a firearm, and the firearm is used in a manner that is reasonably proportional to the valid law enforcement purpose, then there is no constitutional violation.").

*Eyre v. City of Fairbanks, et al.*                                    Case No. 4:19-cv-00038-SLG
Memorandum in Support of State's Motion for Summary Judgment          Page 25 of 49

Case 4:19-cv-00038-SLG   Document 79   Filed 04/27/22   Page 25 of 49

"[C]ourts do not find constitutional violations for gun pointing when there is a reasonable threat of danger or violence to police." *Baird*, 576 F.3d at 346.[84] Special circumstances exist to point a gun at a suspect when (1) the suspect is uncooperative or takes action at the scene that raises a reasonable possibility of danger or flight, (2) the police have information that the suspect is currently armed, (3) the stop closely follows a violent crime, and (4) the police have information that a violent crime is about to occur. *Green v. City and County of San Francisco*, 751 F.3d 1039, 1047 (9th Cir. 2014).

Here, Trooper Nathaniel Johnson's use of his firearm—pointing it at Mr. Eyre—was a valid law enforcement use of his weapon. As the videos and audios clearly show, Mr. Eyre was extremely uncooperative with the officers.[85] The officers knew Mr. Eyre was carrying a gun.[86] The officers knew Mr. Eyre was intoxicated, unstable, and unpredictable. Mr. Eyre's actions of waiving around a loaded gun and pointing it at his own head significantly increased the possibility of danger. Mr. Eyre yelled and screamed at the officers almost continuously and refused repeated attempts to put down his gun. Mr. Eyre then pointed his gun directly at the officers, albeit briefly the first time.[87]

---

[84] *Aponte v. Matos v. Toledo Davilla*, (For example, no constitution violation was found for pointing a gun at an individual who attempted to enter a house that was being searched for weapons)

[85] Exhibits L-Q.

[86] Exhibit B at 4-7.

[87] Exhibit Z at 60:3-8 & 67:16-17.

*Eyre v. City of Fairbanks, et al.*      Case No. 4:19-cv-00038-SLG
Memorandum in Support of State's Motion for Summary Judgment      Page 26 of 49

Case 4:19-cv-00038-SLG    Document 79    Filed 04/27/22    Page 26 of 49

Mr. Eyre's actions more than justified Trooper Nathaniel Johnson's pointing a gun at him *after* he pointed his gun at the officers.[88]

Trooper Nathaniel Johnson also did not shoot and, thus, did not kill or even slightly injure Mr. Eyre in any way. Trooper Nathaniel Johnson is simply in no way responsible for Mr. Eyre's death.

Therefore, Trooper Nathaniel Johnson is entitled to qualified immunity on and dismissal of all of the Estate's claims against him individually as a matter of law.

### D. The Estate's failure-to-intervene claim fails as a matter of law.

In its Complaint, the Estate broadly asserts that "[t]hroughout their continued encounter with Cody, the individual defendants, individually and collectively, used excessive force against Cody and/or failed to intervene while such force was used by their fellow officers."[89] Based on this very broad allegation, it is unclear who allegedly failed to intervene (all of the officers? or just the officer who did not shoot?) in what use of force (the threat of deadly force? or the actual use of deadly force?).[90] However, notwithstanding the ambiguity, no officer violated Mr. Eyre's constitutional rights by

---

[88] Exhibit Z 60:3-8. *See also* Exhibit AA at 22:13-17.

[89] Complaint (DE#1) at ¶36.

[90] A 42 U.S.C. §1983 claim against an individual officer is a claim that the named individual officer personally violated plaintiff's civil rights. As such, there must be an individualized analysis of each officer's alleged conduct—each use of force—to determine whether the factual allegations against each individual officer were sufficient to overcome the officer's qualified immunity. *Cunningham v. Gates*, 229 F.3d 1271, 1289 (9th Cir. 2000). *See Roberts v. City of Omaha*, 723 F.3d 966, 974 (11th Cir. 2013) (district court must conduct individualized analysis of each officer's alleged conduct).

*Eyre v. City of Fairbanks, et al.*                              Case No. 4:19-cv-00038-SLG
Memorandum in Support of State's Motion for Summary Judgment         Page 27 of 49

Case 4:19-cv-00038-SLG   Document 79   Filed 04/27/22   Page 27 of 49

failing to intervene in any other officer's use of force at any time during their encounter with Mr. Eyre.

It is clear that "police officers have a duty to intercede when their fellow officers violate the constitutional rights of a suspect or other citizen." *Cunningham v. Gates*, 229 F.3d 1271, 1289 (9th Cir. 2000) (quotation omitted). "Importantly, however, officers can be held liable for failing to intercede only if they had an opportunity to interceded." *Id.*[91] An officer cannot be held liable under a failure to intervene theory when a fellow officer engages in a split-second use of force.[92] Failure to intervene liability is reserved for circumstances where the use of excessive force extends over a relatively longer period of time such that the other officer in the vicinity has "a reasonable opportunity to observe it, recognize its impermissible character, and take action to stop it." *Andrich v. Kostas*, 470 F.Supp.3d 1048, 1062 (D. Arizona 2020).

Here, as explained above, there was no violation of Mr. Eyre's constitutional rights. No officer used excessive or unreasonable force on Mr. Eyre at any time. At all relevant times, the officers' use of force was reasonable and justified under the

---

[91] *See also Ting v. United States*, 927 F.2d 1504, 1512 (9th Cir. 1991) ("[T]he agents were positioned around the room . . . and were thus physically incapable of preventing the incidents surrounding the shooting, all of which transpired in a matter of seconds. Therefore, it cannot be said that the agents' failure to intervene was the cause in fact of Ting's injuries.").

[92] *See Cunningham*, 229 F.3d at 1290 ("undisputed evidence shows that the non-shooting officers who were present at the shootouts had no 'realistic opportunity' to intercede"); *Gaudreault v. Municipality of Salem,* 923 F.2d 203, 207 n.3 (1st Cir. 1990) (officers had no realistic opportunity to prevent an attack when the attack came quickly and was over in a matter of seconds).

*Eyre v. City of Fairbanks, et al.*       Case No. 4:19-cv-00038-SLG
Memorandum in Support of State's Motion for Summary Judgment     Page 28 of 49

Case 4:19-cv-00038-SLG    Document 79    Filed 04/27/22    Page 28 of 49

circumstances of this case. No duty to intervene arises when there is no violation of a constitutional right to intervene in.

Additionally, as the video and audios demonstrate,[93] there was no opportunity for any of the officers to intervene in any of the other officer's use of deadly force. Each of the officers was trying to protect themselves and their fellow officers in the split-second between when Mr. Eyre turned his loaded handgun on the officers and when the officers fired. The ultimate use of force against Mr. Eyre did not extend over any period of time—it was a split-second decision to defend themselves and their fellow officers when Mr. Eyre pointed his loaded handgun directly at them.[94] There was simply not opportunity for any officer to observe any other officer's reaction, much less take any action to stop it.

Finally, the Ninth Circuit recently acknowledged, "Our precedent does not clearly establish when an officer has a 'realistic opportunity to intercede.'" *Penaloza v. City of Rialto*, 2020 WL 7206904, *2 (9th Cir. December 7, 2020). "Because the law does not clearly establish when an officer must intervene, [the officer] is entitled to summary judgment on qualified immunity grounds for his failure to intervene." *Id*. If the law was not clearly established on when an officer must intervene in 2020, it was not clearly established in December 2017 when Mr. Eyre's incident occurred.

---

[93] Exhibits C, D, L, M, N, O, P, & Q.

[94] Exhibit Z at 68:10-18.

*Eyre v. City of Fairbanks, et al.*                                    Case No. 4:19-cv-00038-SLG
Memorandum in Support of State's Motion for Summary Judgment          Page 29 of 49

Case 4:19-cv-00038-SLG   Document 79   Filed 04/27/22   Page 29 of 49

Therefore, each of the officers is entitled to summary judgment on the Estate's 42 U.S.C. §1983 claim based on a theory of failure-to-intervene. No officer used excessive or unreasonable force against Mr. Eyre. No officer had a "realistic opportunity" to intervene in any other officer's use of deadly force against Mr. Eyre when some of the officers made independent slit-second decisions to shoot in response to Mr. Eyre's actions. Finally, in December 2017, the law did not clearly establish when an officer in their positions must intervene. As such, each of the officers is entitled to summary judgment based on qualified immunity on the Estate's 42 U.S.C. §1983 claims against them individually.

## Part II – Americans With Disabilities Act Claims

In addition to the 42 U.S.C. §1983 claims against the individual officers, the Estate asserts claims against the State of Alaska for violation of Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §12132.[95] The Estate argues that the State of Alaska violated the ADA by denying Mr. Eyre the benefits of a public service or otherwise discriminated against him on the basis of his disability by failing to make reasonable accommodations to address his mental illness during their encounter with Mr. Eyre and by failing to train its employees to make such reasonable accommodations for persons with mental health disabilities.[96]

---

[95] Complaint (DE#1) at ¶¶54-64.

[96] *Id.* at ¶¶60 & 62.

Case 4:19-cv-00038-SLG   Document 79   Filed 04/27/22   Page 30 of 49

Title II of the ADA provides,

> no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.

42 U.S.C. §12132. The Ninth Circuit interprets the phrase "services, programs, or activities" broadly to encompass "anything a public entity does." *Barden v. City of Sacramento*, 292 F.3d 1073, 1076 (9th Cir. 2002) (quoting *Lee v. City of Los Angeles*, 250 F.3d 668, 691 (9th Circ. 2001) (internal quotation marks omitted)). As such, the ADA applies to police "services, programs, or activities." Arrest is undoubtedly a police "service" and something the police "do." Thus, Title II of the ADA applies to arrests in the Ninth Circuit. *Sheehan v. City & Cnty of San Francisco*, 743 F.3d 1211, 1232 (9th Cir. 2014) (*Sheehan I*).[97] Although when applying Title II of the ADA to arrests, "exigent circumstances inform the reasonableness analysis under the ADA, just as they inform the distinct reasonableness analysis under the Fourth Amendment." *Id*. "Just as the constraints of time figure in what is required of police under the Fourth Amendment, they bear on what is reasonable under the ADA." *Waller ex rel. Estate of Hunt v. Danville, VA*, 556 F.3d 171, 175 (4th Cir. 2009).

Court have recognized two basic theories of Title II ADA claims applicable to arrests: wrongful arrest and reasonable accommodation during the arrest. Under a wrongful arrest theory, a person with a disability is wrongfully arrested because the

---

[97] *cert. granted sub nom*, *rev'd in part, cert. dismissed in part sub nom*, *Sheehan II*, 135 S.Ct. at 1178.

*Eyre v. City of Fairbanks, et al.*                    Case No. 4:19-cv-00038-SLG
Memorandum in Support of State's Motion for Summary Judgment          Page 31 of 49

Case 4:19-cv-00038-SLG   Document 79   Filed 04/27/22   Page 31 of 49

officers unreasonably misperceive the effects of an innocent person's disability as criminal activity. *Sheehan I*, 743 F.3d at 1232. For example, mistaking someone's facial paralysis as intoxication. *Roberts. City of Omaha*, 723, F3d 966, 973 (8th Cir. 2013) (citing *Jackson v. Inhabitants of the Town of Sanford*, 1994 WL 586917 at *1 (D. Me. Sept. 23, 1994)). Whereas under a reasonable accommodation theory, although the officers properly arrest a person, the officers fail to reasonably accommodate the person's disability in the course of an investigation or arrest, causing greater injury or indignity in that process than other arrestees would suffer. *Sheehan I*, 743 F.3d at 1232.

Since Mr. Eyre was not wrongfully arrested or seized based on a misperception of effects of a disability as criminal activity, the Estate's claim must be one for failure to reasonably accommodate his disability. In furtherance of their theory, the Estate submits that Mr. Eyre was clearly emotionally distraught yet no effort was made to contact a mental health care professional or a minister/pastor or involve his mother or sister, who were nearby, to assist in deescalating Mr. Eyre.[98] The Estate also asserts that the officers should have pulled back and created a distanced perimeter around Mr. Eyre to maintain communication with him without pressuring or threatening him while at the same time keeping themselves safe.[99] There are simply no such requirements when confronted with an armed, intoxicated, and emotionally distraught individual, and the Estate fails to present a claim as a matter of law. Nor is the law clearly established on this issue.

---

[98] Complaint (DE#1) at ¶¶28[b] & 31.

[99] *Id*. at ¶32.

*Eyre v. City of Fairbanks, et al.*                                    Case No. 4:19-cv-00038-SLG
Memorandum in Support of State's Motion for Summary Judgment          Page 32 of 49

Case 4:19-cv-00038-SLG   Document 79   Filed 04/27/22   Page 32 of 49

"To state a claim for failure to accommodate under Title II of the ADA, a plaintiff must show he or she: (1) is an individual with a disability; (2) is otherwise qualified to participate in or receive the benefit of some public entity's services, programs, or activities; (3) was either excluded from participation in or denied the benefits of the public entity's services, programs or activities or was otherwise discriminated against by the public entity; and (4) was excluded, denied benefits, or discriminated against by reason of his or her disability." *Johnson v. Shasta Cty.*, 83 F.Supp.3d 918, 928 (E.D. Cal. January 6, 2015) (citing *Sheehan I*, 743 F.3d at 1232)).

1. *A qualified individual with a disability*. Mr. Eyre was not a qualified individual with a disability. Under the ADA, a "disability" is a physical or mental impairment that substantially limited one or more major life activities, including "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading concentrating, thinking, communicating, and working." 42 U.S.C. §12102(1). While a disability under the ADA is broadly construed it is not limitless, nor it is conclusory. Disability status under this test may not merely rely on evidence of a medical diagnosis of an impairment. "Instead, the ADA requires those 'claiming the Act's protection . . . to prove a disability by offering evidence that the extent of the limitation [caused by their impairment] in terms of their own experience ... is substantial.'" *Toyota Motor Mfg., Kentucky, Inc. v. Williams*, 534 U.S. 184, 198 (2002) (quoting *Albertson's, Inc. v. Kirkingburg*, 527 U.S. 555, 567 (1999)).

*Eyre v. City of Fairbanks, et al.*      Case No. 4:19-cv-00038-SLG
Memorandum in Support of State's Motion for Summary Judgment   Page 33 of 49

Case 4:19-cv-00038-SLG   Document 79   Filed 04/27/22   Page 33 of 49

Here, the Estate conclusively asserted, Mr. Eyre "had an impairment that substantially limited major life activities."[100]  Conclusory allegations in a complaint, however, are insufficient to maintain a claim under the ADA.  In fact, there is no evidence from a qualified mental health care professional that Mr. Eyre suffered from any disability or impairment, much less any evidence that such a disability or impairment caused him any limitations in his daily life activities.

Mr. Eyre's highly intoxicated, suicidal ramblings do not support an ADA-based claim.  "The vast majority of suicide-based ADA cases involve undisputed and independently-established disabilities, or otherwise tend to indicate that suicidal tendencies do not generate ADA-qualifying disabilities." *Garza v. City of Donna*, 2017 WL 2861456 *8 n.108 (S.D. Texas July 5, 2017) (collecting cases).  "[D]epression, drug overdose, and suicidal tendencies on the night of the incident" are not themselves disabilities under the ADA.  *Norman v. Epperly*, 2008 WL 5099685 *4 (W.D. Mo. November 21, 2008).  As such, Mr. Eyre was not a qualified individual with a disability within the meaning of the ADA, barring the Estate's ADA claims.

2. *Discrimination by reason of such disability*.  Additionally, the State of Alaska did not discriminate against Mr. Eyre by reason of any disability.  Title II requires public entities to provide "meaningful access" to its programs and services.  *Robertson v. Las Animas Cty. Sheriff's Dep't*, 500 F.3d 1185, 1195 (10th Cir. 2007).  "To effectuate Title II's mandate, the regulations require public entities to 'make reasonable modification in

---

[100] Complaint at ¶57.

*Eyre v. City of Fairbanks, et al.*                                    Case No. 4:19-cv-00038-SLG
Memorandum in Support of State's Motion for Summary Judgment          Page 34 of 49

Case 4:19-cv-00038-SLG   Document 79   Filed 04/27/22   Page 34 of 49

policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability.'" *Id*. (quoting 28 C.F.R. §35.130(b)(7)).[101]

The Estate generally contends that the State of Alaska was required to provide Mr. Eyre with "emergency services and other appropriate assistance from EMT's and police officers" and "appropriate medical assistance," including involving his family, a minister or pastor, or mental health professional to deescalate Mr. Eyre.[102] However, "[b]efore a public entity can be required under the ADA to provide a disabled individual an auxiliary aid or service, a public entity must have knowledge of the individual's disability and the individual's need for accommodation." *Robertson*, 500 F.3d at 1196. "[T]he [State] must have knowledge that the individual is disabled, either because that disability is obvious or because the individual (or someone else) has informed the entity of the disability." *Id*. "This is a 'duty dictated by common sense lest a disabled [individual] keep his disability a secret and then sue later for failure to accommodate.'" *Id*. (quoting *Beck v. Univ. of Wis. Bd. of Regents*, 75 F.3d 1130, 1134 (7th Cir. 1996)).

Here, the State, through its officers, did not have knowledge that Mr. Eyre suffered from a qualifying disability at the time of the events in question. Mr. Eyre did not obviously suffer from any physical disabilities. In fact, he walked miles from his home, down Farmer's Loop Road, down the Steese Expressway, and onto City Lights

---

[101] Title II's use of "reasonable modifications" is essentially equivalent to Title I's use of "reasonable accommodation" and the courts use the terms interchangeably. *Robertson*, 500 F.3d at 1195 n.8.

[102] Complaint (DE#1) at ¶¶28[b], 31, 32, 36, 57, 60, & 63.

*Eyre v. City of Fairbanks, et al.*                                   Case No. 4:19-cv-00038-SLG
Memorandum in Support of State's Motion for Summary Judgment          Page 35 of 49

Case 4:19-cv-00038-SLG   Document 79   Filed 04/27/22   Page 35 of 49

Boulevard in freezing temperatures without incident. Mr. Eyre's friend and family specifically informed Dispatch/the officers that he was highly intoxicated and carrying a gun. Yet, no one ever told the officers that Mr. Eyre suffered from any mental health issues prior to or during the officers' encounter with him. A friend of Mr. Eyre's reported that he had a gun, was drunk, and was threatening to commit suicide.[103] Mr. Eyre's mother informed Dispatch, "My son is—has been drinking and he just broke up with his girlfriend and he's walking down the sidewalk and he has a gun, and I would really like you guys to come and pick him up."[104] She further explained, "He's going for a walk. And, I—I—I still would like you guys to pick him up" "because he's really drunk."[105] At one point, Mr. Eyre's sister reported that he yelled at her, "Get the fuck away from me right now."[106] However, at no time during their approximately fifteen minute discourse with Dispatch did either Mr. Eyre's mother or his sister mention that Mr. Eyre suffered from any qualifying mental health disability. What the State, through its officers, knew following these conversations was that the Mr. Eyre was armed with a loaded firearm, very intoxicated, threatening suicide, had broken up with his girlfriend, and did not want to talk to his family. Once the officers made contact with Mr. Eyre it was obvious that he was also highly agitated and angry. He was screaming and yelling

---

[103] Exhibit A at 16.

[104] *Id*. at 2. *See id*. at 4 & 7.

[105] *Id*. at 9 & 12.

[106] *Id*. at 8.

*Eyre v. City of Fairbanks, et al.*                                              Case No. 4:19-cv-00038-SLG
Memorandum in Support of State's Motion for Summary Judgment          Page 36 of 49

Case 4:19-cv-00038-SLG   Document 79   Filed 04/27/22   Page 36 of 49

profanities and growling at them.[107]  Mr. Eyre himself informed the officer that he "drank a whole bottle" of alcohol.[108]  All of Mr. Eyre's actions were consistent with his highly intoxicated state.  Nothing put the officers on notice that he may have also suffered from an underlying mental health condition that rose to the level of a qualifying disability under the ADA.  Thus, at the time the events at issue were rapidly unfolding, the State of Alaska, through its officers, did not have any knowledge that Mr. Eyre was disabled within the meaning of the ADA.  As a matter of law, the State of Alaska cannot reasonably accommodate a qualifying mental health disability it does not know about. *Robertson*, 500 F.3d at 1196.

Nor did the State of Alaska fail to reasonably accommodate Mr. Eyre during the encounter.  The ADA does not require a separate inquiry from the use of force inquiries. "Fourth Amendment scrutiny has already accounted for all the situation's circumstances." *Bates*, 216 F.3d at 373.  "Just like any other relevant personal characteristic—height, strength, aggressiveness—a [person's] known or evident disability is part of the Fourth Amendment circumstantial calculus." *Id*.  Thus, the Fourth Amendment use of force analysis set forth above has already taken into consideration all the specific circumstances of this case.

Under all the circumstances of this encounter, each officer's actions were objectively reasonable.  The officers responded to a plea for help from Mr. Eyre's mother

---

[107]  Exhibits B at 4-5 & C at 1-2.

[108]  Exhibits C at 7 & D at 4.

*Eyre v. City of Fairbanks, et al.*                    Case No. 4:19-cv-00038-SLG
Memorandum in Support of State's Motion for Summary Judgment          Page 37 of 49

Case 4:19-cv-00038-SLG   Document 79   Filed 04/27/22   Page 37 of 49

to pick him up because he was "very drunk." During the officers' attempts to detain Mr. Eyre, he turned his volatility on the officers, escalating his use of force against them by verbally threatening them while pointing a loaded gun at them. In the split-seconds that the officers had to react to Mr. Eyre's use of force, the officers' reactive use of force was objectively reasonable. Additionally, no force was used on Mr. Eyre because of any (unknown) disability. He was not treated differently than any other person who points a loaded gun at officers while verbally threatening to kill them.[109] The officers used deadly force against Mr. Eyre solely because he pointed a loaded gun directly at them while threatening to kill them. Objectively reasonable police behavior is not discrimination.[110]

    3. *Exigent circumstances exception*. Finally, several courts have recognized that "Title II contains an 'exigent circumstances' exception that absolves public entities of their duty to provide any reasonable accommodation" until the scene is secure and there is no longer a threat. *Waller*, 556 F.3d at 175. "Title II does not apply to an officer's on-the-street responses to respond to disturbances or other similar incidents, whether or not those calls involve subjects with mental disabilities, prior to the officer's securing the scene and ensuring that there is no threat to human life." *Hainze v. Richards*, 207 F.3d

---

[109] *See Estate of Vent v. State of Alaska, et al.*, 2020 WL 1046816 (D. Alaska Mar. 3, 2020), *affirmed by*, *Estate of Vent v. State of Alaska, et al.*, 854 Fed.Appx. 799 (Mem) (9th Cir. July 30, 2021).

[110] In fact, it was not possible or practicable to provide medical or mental health care services under the circumstances Mr. Eyre presented to the officers. In order to receive these services—as the officers offered—Mr. Eyre simply needed to put the gun down and walk away from it.

*Eyre v. City of Fairbanks, et al.*      Case No. 4:19-cv-00038-SLG
Memorandum in Support of State's Motion for Summary Judgment      Page 38 of 49

Case 4:19-cv-00038-SLG    Document 79    Filed 04/27/22    Page 38 of 49

795, 801 (5th Cir. 2000). Requiring officers to consider ADA compliance in such tense and rapidly changing situations where the scene is not secure and there is a threat present, such as an armed suspect like Mr. Eyre who is mobile, would be an unacceptable risk to officer and public safety. Therefore, the officers had no duty to accommodate Mr. Eyre's mental disability, if any, before securing the scene and ensuring officer and public safety.

Therefore, Mr. Eyre was not denied the benefits and protections of any service, program, or activity offered by the State of Alaska by virtue of a known qualifying disability. The State of Alaska did not violate Mr. Eyre's rights under the ADA as a matter of law. As such, the State of Alaska is entitled to summary judgment on and dismissal of Mr. Eyre's ADA claims against it.

## Part III – Rehabilitation Act Claim

In addition to the ADA claims, the Estate asserts that the State of Alaska violated the Rehabilitation Act ("RA"), 29 U.S.C. §701, *et seq.*[111] The Estate alleges that the State of Alaska excluded Mr. Eyre from participation in or denied him the benefits of a public service, or otherwise discriminated again him, or failed to reasonably accommodate him on the basis of his disability, subjecting him to discrimination, unnecessary seizure, and death in violation of the RA.[112]

As a preliminary matter, "states are subject to suit in federal court under the Rehabilitation Act [only] if they accept federal Rehabilitation Act funds." *Douglas v.*

---

[111] Complaint (DE#1) at ¶¶54-69.

[112] *Id.* at ¶¶67-68.

*Eyre v. City of Fairbanks, et al.*                     Case No. 4:19-cv-00038-SLG
Memorandum in Support of State's Motion for Summary Judgment          Page 39 of 49

Case 4:19-cv-00038-SLG   Document 79   Filed 04/27/22   Page 39 of 49

*Cal. Dep't of Youth Auth.*, 271 F.3d 812, 819 (9th Cir. 2001), *amended by* 271 F.3d 910

(9th Cir. 2001). The Estate, however, cannot adduce any admissible evidence produced in

this case that the State of Alaska accepts federal Rehabilitation Acts funds. The Estate

conducted absolutely no discovery on this issue. As such, the Estate cannot show that the

State of Alaska is subject to suit in federal court under the Rehabilitation Act, and this

claim must be dismissed.

The Estate's claim also fails on the merits. Section 504 of the Rehabilitation Act

forbids organizations and employers from excluding or denying individuals with

disabilities an equal opportunity to receive program benefits and services. In relevant

part, Section 504 provides,

> No otherwise qualified individual with a disability in the United States, as defined in section 705(20) of this title, shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving federal financial assistance . . ..

29 U.S.C. §794(a). "[T]o state a claim under the Rehabilitation Act, a plaintiff must

allege '(1) he is an individual with a disability; (2) he is otherwise qualified to receive the

benefit; (3) he was denied the benefits of the program solely by reason of his disability;

and (4) the program receives federal financial assistance." *O'Guinn v. Lovelock Corr.

Ctr.,* 502 F.3d 1056, 1060 (9th Cir.2007) (quoting *Duvall v. Cnty. of Kitsap,* 260 F.3d

1124, 1135 (9th Cir.2001)).

"There is no significant difference in analysis of the rights and obligations created

by the ADA and the Rehabilitation Act." *Zukle v. Regents of Univ. of Cal.*, 166 F.3d

1041, 1045 n.11 (9th Cir. 1999).[113]  "With limited exceptions, the same legal principles

govern ADA and RA claims."  *CG v. Pennsylvania Dep't of Educ.*, 734 F.3d 229, 235

(3rd Cir. 2013).  However, the statutes' respective causation elements differ.  *Id*.  While

Title II of the ADA provides the discrimination must be "by reason of such disability,"

the Rehabilitation Act provides the discrimination must be "solely by reason of her or his

disability."  42 U.S.C. §12132; 29 U.S.C. §749(a).  "Because the RA's causation

requirement requires disability to be the sole cause of discrimination, an alternate cause is

fatal to an RA claim because disability would no longer be the sole cause."  *CG*, 734 F.3d

at 236 n.11.[114]

    Since, as discussed above, each officer's use of force was objectively reasonable

and not excessive under the totality of the circumstances of this case, the officers, and

thereby the State of Alaska, did not violate the ADA or the RA.  Additionally, as

discussed above, Mr. Eyre was not an individual with a qualifying disability.  Finally, it

is clear that the Estate cannot show that any discrimination under the Rehabilitation Act

was the *sole* cause of Mr. Eyre's death.  In fact, there is not even an allegation or

---

[113] *See e.g. King v. Hendricks Cnty. Comm'rs*, 954 F.3d 981, 988 (7th Cir. 2020)
("Claims under section 504 of the Rehabilitation Act are treated as 'functionally
identical' to claim under Title II of the ADA."); *Armstrong v. Wilson,* 124 F.3d 1019,
1023 (9th Cir.1997) (noting "Congress has directed that the ADA and RA be construed
consistently").

[114] *See also Shaikh v. Texas A&M Univ. Coll. of Med.*, 739 Fed.Appx. 215, 222 (5th Cir.
2018) ("to satisfy the 'solely' part of the 'solely by reason of' element, the disability must
have been the *only* cause of the . . . conduct' that 'trigger[ed]' the discriminatory action.")
(quoting *Soledad v. U.S. Dep't of Treasury*, 304 F.3d 500, 505 (5th Cir. 2002)).

*Eyre v. City of Fairbanks, et al.*                                    Case No. 4:19-cv-00038-SLG
Memorandum in Support of State's Motion for Summary Judgment        Page 41 of 49

Case 4:19-cv-00038-SLG   Document 79   Filed 04/27/22   Page 41 of 49

assertion that the alleged violation of the Rehabilitation Act was "solely by reason of []
his disability" as required to maintain a Rehabilitation Act claim.[115]  The Estate alleges
that Mr. Eyre's death was the result of common law negligence and breach of the
officer's ordinary duty of care,[116] the State of Alaska's negligent failure to train and
supervise its officers,[117] each officer's failure to intervene in the other officers' use of
force,[118] and, predominantly, the use of excessive force against him.[119]  Each of these
assertions is an alternative basis and negates any claim that discrimination under the
Rehabilitation Act was the *sole* cause of Mr. Eyre's death.

Therefore, Mr. Eyre's Rehabilitation Act claim fails as a matter of law.  The State
of Alaska simply did not violate Mr. Eyre's rights under the Rehabilitation Act and is
entitled to summary judgment on and dismissal of Mr. Eyre's Rehabilitation Act claim
against it.

---

[115] *See* Complaint (DE#1) at ¶¶67-69.

[116] *Id*. at ¶¶41-44.

[117] *Id*. at ¶¶45-50.

[118] *Id*. at ¶36.

[119] *Id*. at ¶¶36 & 53.

*Eyre v. City of Fairbanks, et al.*                                          Case No. 4:19-cv-00038-SLG
Memorandum in Support of State's Motion for Summary Judgment          Page 42 of 49

Case 4:19-cv-00038-SLG   Document 79   Filed 04/27/22   Page 42 of 49

## Part IV - State Law Claim

### A.      Each of the officers is also entitled to qualified immunity on the state law excessive force claim.

In addition to its 42 U.S.C. §1983 excessive force claims, the Estate cursorily asserts that the individual officers committed assault and battery against Mr. Eyre.[120]  A claim for state law assault and battery is simply another way of stating a state law excessive force claim.[121]  However, as discussed above, each of the officers used objectively reasonable force under the circumstances.

"The use of excessive force is a statutory violation under Alaska law and may also run afoul of the Fourth Amendment . . . and . . . the Alaska Constitution, both of which grant citizens the right to be secure in their persons and protect against unreasonable searches and seizures." *Maness*, 307 P.3d at 900-01 (internal quotations omitted). Likewise, Alaska peace officers are protected by qualified immunity. *Id*. at 901.  "In Alaska, questions concerning qualified immunity for claims of excessive force are governed by both the Fourth Amendment and by state statute." *Lum v. Koles*, 314 P.3d 546, 552-53 (Alaska 2013).  Alaska also "follow[s] federal precedent for determining whether qualified immunity should be conferred for [official] acts alleged to contravene a statutory or constitutional mandate." *Maness*, 307 P.3d at 901.

---

[120]  Complaint (DE#1) at ¶82.  Notably, the State of Alaska is immune from a state law tort claim for assault and battery pursuant to Alaska Statute 09.50.250(3).

[121]  *See e.g. State, Dep't of Corrections v. Heisey*, 271 P.2d 1082, 1091 (Alaska 2012) ("[T]here is no distinction between 'excessive force' and 'assault and battery' for purposes of the immunity statute.").

Case 4:19-cv-00038-SLG   Document 79   Filed 04/27/22   Page 43 of 49

As discussed in detail above, under both Alaska law and federal law, the Estate's excessive force claims are unsupported and each individual officer is entitled to qualified immunity. First, each officer's conduct was an objectively reasonable use of force in dealing with the circumstances before them—Mr. Eyre pointing a loaded firearm directly at them while screaming obscenities that they should all die—at the time the force was applied.[122] Second, each officer reasonably believed that his or her conduct was lawful. Nothing in Alaska, Ninth Circuit, United States Supreme Court, or any other jurisdictions' case law, laws, or regulations put these officers "on notice" with clearly established law that their conduct would be considered unlawful. "If the officers reasonably believed that the force they used was permissible, they are entitled to qualified immunity, even if they were mistaken and actually used excessive force." *Lum*, 314 P.3d at 553. From each officer's perspective at the time force was used, reasonable officers in their positions could have, and would have, thought that the threat of deadly force and the use of deadly force was reasonable.[123]

---

[122] *See Lum*, 314 P.3d at 554 ("[I]n excessive force claims [the court] look[s] solely at the officers' use of force in dealing with the situation before them at the time the force was applied.").

[123] *See id*. ("In analyzing qualified immunity questions [the court] focus[es] on the *officers'* perspectives and perceptions, as it is what reasonable officers *in their position* could have thought that is dispositive of the issue.").

*Eyre v. City of Fairbanks, et al.*                                    Case No. 4:19-cv-00038-SLG
Memorandum in Support of State's Motion for Summary Judgment          Page 44 of 49

Case 4:19-cv-00038-SLG   Document 79   Filed 04/27/22   Page 44 of 49

Thus, as with the Estate's 42 U.S.C. §1983 excessive force claims, each of the individual officers is entitled to qualified immunity and dismissal of the Estate's state law excessive force claim against them.[124]

## B.      The Estate's common law negligence, wrongful death, and survivorship claims against the individual officers all fail as a matter of law.

Finally, the Estate asserts that the individual officers breached their duty of ordinary care to avoid unreasonably escalating the encounter with Mr. Eyre to the use of deadly force by failing to call other professionals who have experience with mental health crises to the scene; failing to establish a distanced cordon around Mr. Eyre to limit the risk of harm to everyone and allow him to calm down, pass out, fall asleep, or otherwise reduce the risk he posed to others; failing to establish a cordon around Mr. Eyre to allow his family members to talk to him in an attempt to deescalate the situation; and failing to take "ordinary steps" to provide Mr. Eyre with alternative resolutions other than surrender at gun point or kill himself.[125]

The Estate's state law negligence claims fail as a matter of law for the same reasons its excessive force claims fail – each officer's actions were reasonable and conformed to the standards required of them under the circumstances.

Dean Prosser stated the elements of a cause of action for negligence are:

---

[124] *See Prentzel v. State, Dep't of Pub. Safety*, 169 P.3d 573, 589-90 (Alaska 2007) (concluding that officers were entitled to statutory and common law qualified immunity on plaintiff's state law and §1983 claims).

[125] Complaint (DE#1) at ¶¶42(a)-(d).

*Eyre v. City of Fairbanks, et al.*                                                    Case No. 4:19-cv-00038-SLG
Memorandum in Support of State's Motion for Summary Judgment          Page 45 of 49

Case 4:19-cv-00038-SLG   Document 79   Filed 04/27/22   Page 45 of 49

1.  A duty . . . requiring the actor to conform to a certain standard of conduct, for the protection of others against unreasonable risk.

2.  A failure on his part to conform to the standard required . . ..

3.  A reasonable close casual connection between the conduct and the resulting injury. . . . (proximate cause)

4.  Actual loss or damage resulting to the interests of another. . . .

*State v. Abbott*, 498 P.2d 712, 725 (Alaska 1972) (quoting W. Prosser, Torts §30 at 143 (4th Ed. 1971)). In other words, before a defendant can be held liable for a plaintiff's damages under a theory of negligence, there must be a duty, breach of the duty, causation, and damages. *Lyons v. Midnight Sun Transp. Serv's, Inc.*, 928 P.2d 1202, 1204 (Alaska 1996).

At a minimum, no officer breached any duty owed to Mr. Eyre. As discussed above, each officer's actions leading up to and in shooting Mr. Eyre were objectively reasonable and necessary under the circumstances Mr. Eyre created at the time such force was used. The Estate's negligence claims are based on the identical facts and circumstances as its excessive force claims – Mr. Eyre's shooting death on December 24, 2017.[126] Each officer's conduct leading up to and including the shooting conformed to the standards required and were objectively reasonable under the circumstances. Thus, none of the officers acted negligently as a matter of law.[127]

---

[126] *See* Complaint (DE#1).

[127] *See e.g. Maness*, 307 P.3d at 905 ("Our holding above that the troopers' conduct was objectively reasonable and necessary compels the conclusion that they acted without gross negligence.").

*Eyre v. City of Fairbanks, et al.*                                    Case No. 4:19-cv-00038-SLG
Memorandum in Support of State's Motion for Summary Judgment          Page 46 of 49

Case 4:19-cv-00038-SLG   Document 79   Filed 04/27/22   Page 46 of 49

Additionally, the court is not bound by the label that the Estate attaches to its tort claims, the court looks to the substance of the claims. *Dep't of Corrections v. Heisey*, 271 P.3d, 1082, 1092 (Alaska 2012). Since the basis of the Estate's negligence claims is exactly the same as the basis for its assault and battery claim, the Estate's negligence claims against each of the individual officers fails for the same reasons as its assault and battery—excessive force claim fails.

Therefore, each of the individual officers is entitled to summary judgment on and dismissal of the Estate's state common law negligence, wrongful death, and survivorship claims as a matter of law.

<h3 align="center">Conclusion</h3>

The Estate of Cody Eyre's claims against the individual officers and remaining claims against the State of Alaska fail as a matter of law. Each individual officer is entitled to qualified immunity and dismissal of all of the Estate's excessive force claims against each of them individually and all state law claims stemming from the same conduct. Not only did each officer use objectively reasonable force against Mr. Eyre under the circumstances Mr. Eyre created, but the law is clearly established that each officer may use deadly force when confronted with an immediate threat to the safety of themselves and others present at the scene. Additionally, the Estate's Americans with Disabilities Act and Rehabilitation Act claims against the State of Alaska fail as a matter of law. Therefore, all remaining claims in this case must be dismissed with prejudice.

*Eyre v. City of Fairbanks, et al.*                    Case No. 4:19-cv-00038-SLG
Memorandum in Support of State's Motion for Summary Judgment        Page 47 of 49

Case 4:19-cv-00038-SLG   Document 79   Filed 04/27/22   Page 47 of 49

DATED at Fairbanks, Alaska, this 27th day of April, 2022.

TREG R. TAYLOR
ATTORNEY GENERAL

By: s/ *Aisha Tinker Bray*
Aisha Tinker Bray
Alaska Bar No. 9505028
Attorney for State of Alaska &
Trooper Brian Hibbs

**CERTIFICATE OF SERVICE**
This is to certify that on this
27th day of April, 2022, a copy
of the foregoing document was
served electronically by ECF
on:

March C. Choate, Esq.
Clinton M. Campion, Esq.
Zane D. Wilson, Esq.

Pursuant to D.Ak.LR 5.4 a chamber's
copy with exhibits was mailed.

s/ Aisha Tinker Bray

*Eyre v. City of Fairbanks, et al.*                                Case No. 4:19-cv-00038-SLG
Memorandum in Support of State's Motion for Summary Judgment          Page 48 of 49

Case 4:19-cv-00038-SLG   Document 79   Filed 04/27/22   Page 48 of 49

**Table of Exhibits**

| Exhibit | Description |
|---------|-------------|
| A | Transcripts of Dispatch Calls (DPS 00184-185) <br> Transcript of 12/24/17 Interview of Officer Larimer (DPS-00186) <br> Transcript of 1/24/17 Interview of Officer Sweet (DPS-00187) |
| B | Transcript of Radio Traffic 12/24/17 (DPS-01351-60) |
| C | Transcript from Officer Larimer's body camera (DPS 01249-64) |
| D | Transcript from Officer Sweet's body camera (DPS 01214-26) |
| E | Transcripts of Audio Recordings (DPS-00211-217) |
| F | Transcript of Interview of Trooper Thomas (DPS-01323-50 & 01735) |
| G | Transcript of Interview of Trooper Elondre Johnson (DPS-01361-81) |
| H | Transcript of Interview of Trooper Joslin (DPS-01300-22) |
| I | Transcript of Interview of Officer Larimer (DPS-01227-48) |
| J | Transcript of Interview of Officer Sweet (DPS-01265-35, & 01731) |
| K | Transcripts of Audio Recordings (DPS-001102-10) |
| L | Video Officer Sweet Body Cam[128] (DPS-00206)[129] |
| M | Video Officer Sweet's Dash Cam (DPS-00207) (no audio) |
| N | Video Officer Larimer Body Cam (DPS-00208) |
| O | Trooper Joslin's audio (DPS-00215) |
| P | Trooper E. Johnson's audio (DPS-00216) |
| Q | Trooper Thomas' audio (DPS-00217) |
| R | Photos of Mr. Eyre's loaded gun (DPS-0135-37) |
| S | Affidavit of Officer Sweet |
| T | Affidavit of Officer Larimer |
| U | Affidavit of Trooper Elondre Johnson |
| V | Affidavit of Trooper Nathaniel Johnson |
| W | Affidavit of Trooper Joslin |
| X | Affidavit of Trooper Thomas |
| Y | Deposition Transcript for Trooper Joslin |
| Z | Deposition Transcript for Trooper Nathaniel Johnson |
| AA | Deposition Transcript for Trooper Thomas |
| AB | Deposition Transcript for Trooper Elondre Johnson |
| AC | Deposition Transcript for Officer Larimer |
| AD | Deposition Transcript for Officer Sweet |

---

[128] The first three minutes of Officer Sweet's body cam footage involve an unrelated incident.

[129] Exhibits L, M, N, O, P, & Q were filed conventionally with the Clerk's Office on April 30, 2021.

*Eyre v. City of Fairbanks, et al.*          Case No. 4:19-cv-00038-SLG
Memorandum in Support of State's Motion for Summary Judgment     Page 49 of 49

Case 4:19-cv-00038-SLG    Document 79    Filed 04/27/22    Page 49 of 49