# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ALASKA

KYLE EYRE, *personal representative of Cody Eyre*,

        Plaintiff,

    v.

THE CITY OF FAIRBANKS, *et al.*,

        Defendants.

Case No. 4:19-cv-00038-SLG

## ORDER RE MOTION FOR SUMMARY JUDGMENT

Before the Court at Docket 78 is defendants State of Alaska and Alaska State Troopers ("AST") Elondre Johnson, Nathaniel Johnson, James Thomas III, and Christine Joslin's Motion for Summary Judgment (collectively, the "State"), as well as a memorandum in support of the motion at Docket 79. Defendants City of Fairbanks police officers Richard Sweet and Tyler Larimer joined the State's motion at Docket 80 and defendant City of Fairbanks ("City") joined as well at Docket 82. Plaintiff Kyle Eyre, the personal representative of the Estate of Cody Eyre, responded in opposition at Docket 83 and the State replied at Docket 85. Defendants Sweet and Larimer at Docket 86 and the City at Docket 87 all joined the State's reply. Oral argument was held on July 22, 2022.

# BACKGROUND

This is a tragic case about the death of Cody Eyre, who was shot to death by officers of the City of Fairbanks Police Department and troopers with the State of Alaska Department of Public Safety (collectively, "responding officers").

On December 24, 2017, Eyre went on Facebook and started a live stream. He was drinking and he had a gun; according to his friend Shawn Steele, the gun looked like a .22 Magnum revolver. Eyre said that the gun had one bullet in it and that he was going to use it to kill himself. Then he ended the live stream. Steele was concerned for Eyre's safety and tried contacting him.[1] Unable to reach Eyre, Steele contacted Eyre's parents. Approximately 5 to 10 minutes after Eyre ended the live stream, Steele called the police.[2] Steele asked the police to respond to a possible suicide in progress.[3] Trooper Elondre Johnson, the officer in charge that evening, decided not to respond to the call because Eyre "was in his residence, alone . . . with a gun," "there was no other person in jeopardy," and Elondre Johnson "didn't think there was any reason for AST to respond."[4]

Later that same evening, Magdalena Eyre,[5] Cody Eyre's mother, called the

---

[1] Docket 79-1 at 18–19.

[2] Docket 79-1 at 20.

[3] Docket 79-1 at 17.

[4] Docket 79-7 at 2–3.

[5] The Complaint refers to Cody Eyre's mother as "Magdalena Eyre." Docket 1 at 5, ¶ 24. However, in the audio transcript from the 911 call, she is identified as "Jean Eyre." *See, e.g.*, Docket 79-1 at 9. This is an unexplained discrepancy. The Court will identify her as "Magdalena Eyre" in accordance with the Complaint.

Case No. 4:19-cv-00038-SLG, *Eyre v. The City of Fairbanks, et al.*
Order re Motion for Summary Judgment
Page 2 of 61

Case 4:19-cv-00038-SLG   Document 95   Filed 02/23/23   Page 2 of 61

police.  Magdalena Eyre and her daughter were in their car following Cody Eyre, who was walking down Farmers Loop road.[6]  She told the dispatcher her son had "just broke[n] up with his girlfriend" and that he was "walking down the sidewalk and he ha[d] a gun."[7]  While they were on the phone with the dispatcher, her daughter got out of the car to try to talk with Cody Eyre, but he told her "get the f*** away from me right now."[8]  Magdalena Eyre reported that the gun was in Eyre's holster on his hip and she did not know whether the gun was loaded.[9]  When the dispatcher asked whether it was unusual for Eyre to be carrying his gun, she said she was only aware that he carried it with him when he went hunting; "otherwise, I don't think he carries a gun."[10]  When the dispatcher asked whether he had ever done anything violent, she responded, "[n]o, he's not a violent person."  She requested police assistance to "pick him up" because she was "worried about him falling in the traffic."[11]  It was approximately minus 8 degrees Fahrenheit that evening.[12]

Magdalena Eyre spoke with the same dispatcher who had spoken with

---

[6] Docket 79-1 at 3.

[7] Docket 79-1 at 3.

[8] Docket 79-1 at 9.

[9] Docket 79-1 at 4, 8.

[10] Docket 79-1 at 9.

[11] Docket 79-1 at 3, 13.

[12] Docket 79-5 at 17.

Case No. 4:19-cv-00038-SLG, *Eyre v. The City of Fairbanks, et al.*
Order re Motion for Summary Judgment
Page 3 of 61

Case 4:19-cv-00038-SLG   Document 95   Filed 02/23/23   Page 3 of 61

Steele earlier that evening.[13] The dispatcher told Magdalena Eyre and her daughter to keep their distance from Cody Eyre "because [the dispatcher] d[id]n't want anyone to make contact with him," warning "who knows what he will do."[14] The dispatcher could hear Cody Eyre yelling in the background of the call.[15] The dispatcher continued, "[l]et's not put any pressure on him or provoke him in any way. If he doesn't want anyone going near him, then let's go ahead and respect that."[16] The dispatcher got in contact with Elondre Johnson and informed him that a "welfare check call" came in from Magdalena Eyre. Elondre Johnson started mobilizing a response.[17]

Cody Eyre got onto the Steese highway, crossed the highway, and started heading south towards Fairbanks in the northbound lane of traffic.[18] As more officers arrived on the scene, they all reported that Eyre was making noises that sounded like "distraught growling" and that he was "[c]learly agitated; screaming and yelling" things like "[f]*** you."[19] Elondre Johnson told the responding officers "to try and at least get him in our sights," to try to establish contact with the public

---

[13] Docket 79-1 at 13.

[14] Docket 79-1 at 7, 10.

[15] Docket 79-1 at 9.

[16] Docket 79-1 at 10.

[17] Docket 79-2 at 1.

[18] Docket 79-1 at 11–12; Docket 79-2 at 2–3.

[19] Docket 79-2 at 4–5; Docket 79-3 at 1.

Case No. 4:19-cv-00038-SLG, *Eyre v. The City of Fairbanks, et al.*
Order re Motion for Summary Judgment
Page 4 of 61

Case 4:19-cv-00038-SLG   Document 95   Filed 02/23/23   Page 4 of 61

address system, and to "stop any traffic going northbound."[20]   Troopers James Thomas, Nathaniel Johnson, and Elondre Johnson all got out of their cars and ordered Eyre to drop his gun.[21]   Eyre threatened to shoot himself, saying "I will f***ing blow my head off."[22]   Nathaniel Johnson said "[w]e can get you help" and tried to connect with Eyre because they had both been in the military.[23]   Eyre repeatedly told the responding officers that he was "not going to shoot [them]" and that he "d[id]n't want to hurt any of [them.]"[24]   Nonetheless, Eyre would not heed the responding officers' orders to drop his gun, saying "I literally am not going to f***ing drop this gun."[25]   Eyre continued walking toward the Johansen-Steese intersection, which was a "busy intersection" that was "full of people" with "all sorts of people . . . doing Christmas Eve stuff."[26]

At this point, it is not clear from the record what Eyre was doing with his gun. Several responding officers saw Eyre point his gun at his head as he walked along the Steese Highway, although Elondre Johnson and Nathaniel Johnson acknowledged it was hard for them to see.[27]   Nathaniel Johnson said that "[a]t that

---

[20] Docket 79-2 at 3.

[21] Docket 79-3 at 1–4.

[22] Docket 79-3 at 1.

[23] Docket 79-3 at 4.

[24] Docket 79-3 at 1–3, 7.

[25] Docket 79-4 at 2.

[26] Docket 79-2 at 7; 79-9 at 5.

[27] Docket 79-2 at 6; Docket 79-5 at 11.

Case No. 4:19-cv-00038-SLG, *Eyre v. The City of Fairbanks, et al.*
Order re Motion for Summary Judgment
Page 5 of 61

Case 4:19-cv-00038-SLG   Document 95   Filed 02/23/23   Page 5 of 61

point, I don't think that he ever pointed it at anything else but his head."[28]  Thomas's account is similar; he said that he could "see the weapon very well" and that Eyre did not point the gun at the police or at any other driver at this point.[29]

Elondre Johnson also said, however, that Eyre had "gestured the gun towards me at least twice" and that he "w[ould]n't put the gun down" and "continued to scream."[30]  Then Elondre Johnson saw Eyre "lift[] up his firearm towards me," but Elondre Johnson "never had an opportunity for a clear shot because [they] were still in proximity to this intersection and it was active," so "it would have been reckless on [Elondre Johnson's] part" to shoot.[31]  Similarly, City of Fairbanks Police Officer Richard Sweet heard someone say over the radio that Eyre had pointed his weapon at police officers.[32]  And Trooper Christine Joslin heard over the radio that Eyre "had already brandished the gun at Troopers," but that they "were trying to negotiate with him and . . . find a peaceful resolution."[33]  Shortly thereafter, Joslin said that the situation started to "escalate[]" and she heard Thomas over the radio say something like "if he points the gun at me," then "I'm going to shoot him."[34]  Although the responding officers appear to have been concerned about Eyre

---

[28] Docket 79-5 at 12.

[29] Docket 79-6 at 13.

[30] Docket 79-2 at 7; Docket 79-7 at 21.

[31] Docket 79-7 at 7.

[32] Docket 79-10 at 4.

[33] Docket 79-8 at 3.

[34] Docket 79-8 at 5.

Case No. 4:19-cv-00038-SLG, *Eyre v. The City of Fairbanks, et al.*
Order re Motion for Summary Judgment
Page 6 of 61

Case 4:19-cv-00038-SLG   Document 95   Filed 02/23/23   Page 6 of 61

pointing his gun at them, and Thomas even expressed an intent to shoot if Eyre did so, there does not appear to be any evidence that the officers warned Eyre that they would use lethal force if he pointed his gun at them.

Eyre turned away from the Steese intersection and ended up walking down a road leading toward two churches.[35] Sweet told Eyre that he "[could not] go into that residential area" and told Eyre to drop the gun so that they could "get [him] to somebody to talk to."[36] Elondre Johnson and Lieutenant Wassmann, who is not a party to this suit, had a quick conversation about what type of force might need to be used.[37] Wassmann advised that "you're just going to have to follow and if he starts to try and go into a house or anything you might have to use force on him."[38]

Although the responding officers expressed concerns about Eyre endangering nearby residents, at this point in the evening, Eyre had walked away from a busy intersection and was walking down a deserted road. The road ended in a cul-de-sac surrounded by a berm of snow.[39] The closest residential area was approximately 200 yards away, and to access the residential area, Eyre would have had to walk over the snow berm and then traverse a field of snow.[40]

---

[35] Docket 79-6 at 29; Docket 79-27 at 11–12; Docket 79-29 at 13–14.

[36] Docket 79-3 at 6.

[37] Docket 79-7 at 10–11.

[38] Docket 79-2 at 8.

[39] Docket 45-12 at 9:35–13:54; Docket 79-29 at 14.

[40] Docket 79-3 at 7; Docket 79-29 at 14; Docket 79-30 at 19.

Case No. 4:19-cv-00038-SLG, *Eyre v. The City of Fairbanks, et al.*
Order re Motion for Summary Judgment
Page 7 of 61

Case 4:19-cv-00038-SLG   Document 95   Filed 02/23/23   Page 7 of 61

As Eyre walked down the deserted road, six of the responding officers lined up across the road and pointed their weapons at him. When Eyre walked, they followed, and whenever he stopped, they stopped.[41] The responding officers remained approximately 30 to 40 yards from Eyre.[42] Elondre Johnson acknowledged that they had "six people who don't train together" and "at some point our proximity, I think it got you know . . . uncomfortably close."[43]

As the officers followed Eyre in lockstep down the deserted road, Elondre Johnson acknowledged that "it was hard to see [Eyre]" because "it was dark" and Eyre's movements were "erratic and not consistent."[44] There were no streetlights in the area, so they had to use the headlights from police vehicles.[45] Eyre asked that the responding officers "[t]urn [their] light off right now," saying "I'm serious[,] I cannot see," and the officers refused to do so.[46] However, as Eyre walked further down the road, they "start[ed] to lose the effectiveness of the lights from [the patrol] car."[47]

Nathaniel Johnson said that when Eyre started walking down the deserted road towards the church, "that's when he started getting a little bit crazier," that

---

[41] Docket 45-12 at 9:35–13:54; Docket 79-6 at 13.

[42] Docket 79-5 at 14.

[43] Docket 79-7 at 9.

[44] Docket 79-7 at 10.

[45] Docket 79-8 at 11; Docket 79-10 at 10, 15.

[46] Docket 79-5 at 27.

[47] Docket 79-10 at 22.

Case No. 4:19-cv-00038-SLG, *Eyre v. The City of Fairbanks, et al.*
Order re Motion for Summary Judgment
Page 8 of 61

Case 4:19-cv-00038-SLG    Document 95    Filed 02/23/23    Page 8 of 61

"[h]e'd start waving the gun around a little bit," although he mostly pointed the gun at himself or at the ground, but "[a]t one point, he did point the gun our direction."[48] Nathaniel Johnson said he would have fired at that point, but his hands were too cold and numb to move fast enough.[49] At one point, Eyre dropped to his knees and put his gun under his chin, saying "I just want to die."[50] Nathaniel Johnson said that "I thought he was just going to commit suicide right there."[51] Thomas "confirmed that medics were staged by," saying "at that point I thought he was going to shoot himself."[52]

Instead of shooting himself, Eyre stood up and continued walking down the road, but according to Thomas, "once he realize[d]" that the road ended in a "kind of a cul-de-sac," then "he turn[ed] around again, [he] yell[ed] at [the officers], he [took] maybe one or two steps to the left" and then "he pointed [his gun]" at the officers.[53] Eyre yelled "[y]ou guys can f***ing die right now and I don't give a f***."[54] Larimer and Sweet both fired their rifles.[55] Joslin and Thomas fired multiple rounds

---

[48] Docket 79-5 at 15–16.

[49] Docket 79-5 at 15.

[50] Docket 79-6 at 14.

[51] Docket 79-5 at 19.

[52] Docket 79-6 at 15.

[53] Docket 79-6 at 15. Several of the responding officers also reported that they saw Eyre point the gun at them. Docket 79-5 at 16–17; Docket 79-6 at 16–17; Docket 79-7 at 12; Docket 79-8 at 14-15; Docket 79-9 at 9; Docket 79-10 at 23. Whether Eyre pointed his gun at the responding officers before he was shot is discussed in more detail in Section IB.

[54] Docket 79-3 at 8.

[55] Docket 79-1 at 22, 26.

Case No. 4:19-cv-00038-SLG, *Eyre v. The City of Fairbanks, et al.*
Order re Motion for Summary Judgment
Page 9 of 61

Case 4:19-cv-00038-SLG   Document 95   Filed 02/23/23   Page 9 of 61

from their AR-15s.[56]  Elondre Johnson fired several rounds from his shotgun.[57] Nathaniel Johnson tried to fire, but his fingers were too numb.[58]

After the first rounds were fired, several responding officers reported that it looked like Eyre was still moving.[59]  Thomas said "he didn't go down . . . he was still moving . . . he might have turned a little bit to his right," so Thomas "fired again." Thomas said "I could see the glint of the weapon, but I didn't know for sure whether it was still pointed at us or not.  With the temperature inversion and everything . . . it was difficult to see after those first initial two rounds with all the moisture and the gasses in the air and what not."[60]  Joslin fired another round as well because she saw Eyre "roll[] over and the gun was pointed at us again."[61]  While they waited for the smoke to clear, Sweet gave the order to "[s]eize [sic] fire" and to shoot "[o]nly if you can see him moving."[62]  Multiple bullets struck Eyre, including shots that hit him in the head and the leg.[63]

Kyle Eyre, Cody Eyre's father and the personal representative of the Estate

---

[56] Docket 79-5 at 4, 6.

[57] Docket 79-5 at 8.

[58] Docket 79-5 at 17.

[59] Docket 79-7 at 17.

[60] Docket 79-6 at 18.

[61] Docket 79-8 at 16.

[62] Docket 79-10 at 24.

[63] Docket 79-2 at 9.

Case No. 4:19-cv-00038-SLG, *Eyre v. The City of Fairbanks, et al.*
Order re Motion for Summary Judgment
Page 10 of 61

Case 4:19-cv-00038-SLG   Document 95   Filed 02/23/23   Page 10 of 61

of Cody Eyre (hereinafter "the Estate"), initiated this action on December 2, 2019.[64] The defendants are the City of Fairbanks, Fairbanks Police Department Officers Richard Sweet and Tyler Larimer, the State of Alaska, and Alaska State Troopers Elondre Johnson, Nathaniel Johnson, James Thomas III, and Christine Joslin (collectively, "defendants").[65] The Complaint alleges nine causes of action against the defendants (individually or collectively) including: common law negligence,[66] negligent failure to train and supervise,[67] excessive force in violation of the Fourth Amendment,[68] failure to accommodate and failure to train in violation of the Americans with Disabilities Act (ADA),[69] violation of the Rehabilitation Act (RA),[70] individual liability for wrongful death,[71] vicarious liability for wrongful death,[72] and assault and battery.[73]

The City of Fairbanks filed a Motion to Dismiss for Lack of Standing at Docket 25, which the Court denied at Docket 37. The State of Alaska filed a Motion

---

[64] Docket 1 at 2, ¶ 4; Docket 29 at 3, ¶ 6.

[65] Docket 1 at 3–4, ¶¶ 5–13. The Complaint also named Ron Dupree as a defendant, but he has not been served a summons and has not appeared in this action. Docket 1 at 3, ¶ 9.

[66] Docket 1 at 9–10, ¶¶ 41–44.

[67] Docket 1 at 10–11, ¶¶ 45–50.

[68] Docket 1 at 11, ¶ 53.

[69] Docket 1 at 11–12, ¶¶ 54–61; Docket 1 at 13, ¶¶ 62–64.

[70] Docket 1 at 13–14, ¶¶ 65–69.

[71] Docket 1 at 14–15, ¶¶ 70–77.

[72] Docket 1 at 15–16, ¶¶ 78–81.

[73] Docket 1 at 16, ¶ 82.

Case No. 4:19-cv-00038-SLG, *Eyre v. The City of Fairbanks, et al.*
Order re Motion for Summary Judgment
Page 11 of 61

Case 4:19-cv-00038-SLG   Document 95   Filed 02/23/23   Page 11 of 61

to Dismiss at Docket 18 on the basis of its Eleventh Amendment immunity, and the Court granted that motion as to the state law and 42 U.S.C. § 1983 claims and denied it with respect to the ADA and RA claims at Docket 40. The defendants filed two motions for summary judgment at Dockets 44 and 48, which the Court denied without prejudice to permit additional discovery at Docket 65. On April 27, 2022, the State of Alaska and the named Alaska State Troopers filed the Motion for Summary Judgment that is now before the Court at Docket 78. The remaining defendants have since joined that motion at Dockets 80 and 82.

## JURISDICTION

The Court has jurisdiction over Eyre's federal claims pursuant to 28 U.S.C. § 1331. The Court also exercises its supplemental jurisdiction over Eyre's state law claims pursuant to 28 U.S.C. § 1367.

## LEGAL STANDARD

Federal Rule of Civil Procedure 56(a) directs a court to "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." "The party moving for summary judgment bears the initial burden of demonstrating the absence of a genuine issue of fact for trial."[74] However, "[w]hen the nonmoving party has the burden of proof at trial, the moving party need only point out 'that there is an

---

[74] *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).

Case No. 4:19-cv-00038-SLG, *Eyre v. The City of Fairbanks, et al.*
Order re Motion for Summary Judgment
Page 12 of 61

absence of evidence to support the nonmoving party's case.'"[75]

If the movant meets its burden, the nonmoving party must demonstrate "specific facts showing that there is a genuine issue for trial."[76] The nonmoving party may not rely on "mere allegations or denials"; rather, to reach the level of a genuine dispute, the evidence must be such "that a reasonable jury could return a verdict for the nonmoving party."[77] In deciding a motion for summary judgment, a court views the facts in the light most favorable to the nonmoving party and draws "all justifiable inferences" in the nonmoving party's favor.[78]

## DISCUSSION

### I. Fourth Amendment Claim

#### A. Legal Principles

Defendants contend that they are all entitled to qualified immunity as to the federal excessive force claim brought pursuant to 42 U.S.C. § 1983.[79] The doctrine of qualified immunity shields government actors from civil liability under § 1983 if "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."[80] Government officials are not

---

[75] *Id.* at 1076 (quoting *Celotex Corp.*, 477 U.S. at 325).

[76] *Celotex*, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)).

[77] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

[78] *Id.* at 255 (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59 (1970)).

[79] Docket 79 at 8–24; Docket 80; Docket 82.

[80] *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

Case No. 4:19-cv-00038-SLG, *Eyre v. The City of Fairbanks, et al.*
Order re Motion for Summary Judgment
Page 13 of 61

Case 4:19-cv-00038-SLG   Document 95   Filed 02/23/23   Page 13 of 61

entitled to qualified immunity on summary judgment if (1) the facts taken in the light most favorable to the plaintiff show that the officials' conduct violated a constitutional right, and (2) that right was clearly established at the time of the alleged violation.[81]  Qualified immunity applies unless both prongs of the inquiry are satisfied.[82]A court may "exercise [its] sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first."[83] However, it "is often beneficial" to analyze the first prong first and then the second prong because this process "promotes the development of constitutional precedent and is especially valuable with respect to questions that do not frequently arise in cases in which a qualified immunity defense is unavailable."[84]

When evaluating a Fourth Amendment claim of excessive force, courts consider "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them."[85]  This "requires a careful balancing of 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake."[86]  Courts

---

[81] *See Castro v. County of Los Angeles*, 833 F.3d 1060, 1066 (9th Cir. 2016) (citing *Pearson v. Callahan*, 555 U.S. 223, 232 (2009)).

[82] *See Pearson*, 555 U.S. at 232.

[83] *Id*. at 236.

[84] *Id.*

[85] *Graham v. Connor*, 490 U.S. 386, 397 (1989).

[86] *Id.* at 396 (quoting *Tennessee v. Garner*, 471 U.S. 1, 8 (1985)).

Case No. 4:19-cv-00038-SLG, *Eyre v. The City of Fairbanks, et al.*
Order re Motion for Summary Judgment
Page 14 of 61

consider "whatever specific factors may be appropriate in a particular case."[87] These factors include "the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; [and] the threat reasonably perceived by the officer."[88] Additional relevant factors may "include the availability of less intrusive alternatives to the force employed, whether proper warnings were given and whether it should have been apparent to officers that the person they used force against was emotionally disturbed."[89]

"The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."[90] "Only information known to the officer at the time the conduct occurred is relevant."[91] And while the availability of alternative measures to respond to a situation may be a relevant consideration in some cases, officers "need not avail themselves of the least intrusive means of responding to an exigent situation; they need only act within that range of conduct we identify as

---

[87] *Franklin v. Foxworth*, 31 F.3d 873, 876 (9th Cir. 1994).

[88] *Lombardo v. City of St. Louis*, 141 S. Ct. 2239, 2241 (2021) (quoting *Kingsley v. Hendrickson*, 576 U.S. 389, 397 (2015)).

[89] *Glenn v. Washington County*, 673 F.3d 864, 872 (9th Cir. 2011).

[90] *Graham*, 490 U.S. at 396 (citing *Terry v. Ohio*, 392 U.S. 1, 20–22 (1968)).

[91] *Nehad v. Browder*, 929 F.3d 1125, 1132 (9th Cir. 2019).

Case No. 4:19-cv-00038-SLG, *Eyre v. The City of Fairbanks, et al.*
Order re Motion for Summary Judgment
Page 15 of 61

reasonable."[92]

## B. Analysis of the Relevant Factors

To assess whether a reasonable jury could conclude that the responding officers violated Eyre's constitutional right to be free from the use of excessive force, the Court analyzes all of the relevant factors that the Supreme Court and Ninth Circuit have identified.

First, with respect to the quantum of force used against Eyre, the parties do not dispute that the force used was lethal.[93] It is well established that "[t]he use of deadly force implicates the highest level of Fourth Amendment interests."[94] The Court must determine whether the government's countervailing interests at stake were sufficient to justify the use of deadly force.[95]

The Court next considers the fact that the responding officers were not responding to an alleged crime; instead, they were responding to an alleged mental health crisis. When responding to a mental health crisis, "the use of officers and others trained in the art of counseling is ordinarily advisable."[96] "This is because when dealing with a disturbed individual, 'increasing the use of force may

---

[92] *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994).

[93] Docket 79 at 13.

[94] *A.K.H. ex rel Landeros v. City of Tustin*, 837 F.3d 1005, 1011 (9th Cir. 2016).

[95] *Graham*, 490 U.S. at 396.

[96] *Deorle v. Rutherford*, 272 F.3d 1272, 1283 (9th Cir. 2001).

Case No. 4:19-cv-00038-SLG, *Eyre v. The City of Fairbanks, et al.*
Order re Motion for Summary Judgment
Page 16 of 61

. . . exacerbate the situation,' unlike when dealing with a criminal, where increased force is more likely to 'bring[] a dangerous situation to a swift end.'"[97]  And "[e]ven when an emotionally disturbed individual is 'acting out' and inviting officers to use deadly force to subdue him, the governmental interest in using such force is diminished by the fact that the officers are confronted, not with a person who has committed a serious crime against others, but with a mentally ill individual."[98]  This is not to say, however, that there is "a per se rule establishing two different classifications of suspects: mentally disabled persons and serious criminals."[99]  Instead, "where it is or should be apparent to the officers that the individual involved is emotionally disturbed, that is a factor that must be considered in determining . . . the reasonableness of the force employed."[100]

The responding officers in this case were aware that Eyre was drunk, suicidal, and distraught.[101]  The Ninth Circuit has held that "[v]iewing the facts in the light most favorable to the plaintiff, the 'crime at issue'" when police responded to a call to help a suicidal individual "was not 'severe' by any measure" because the decedent's "family did not call the police to report a crime at all, but rather to

---

[97] *Glenn*, 673 F.3d at 877 (alterations in original) (quoting *Deorle*, 272 F.3d at 1283).

[98] *Deorle*, 272 F.3d at 1283.

[99] *Id.*

[100] *Id.*

[101] Docket 79-1 at 3, 17; Docket 79-6 at 27; Docket 79-7 at 21; Docket 79-8 at 3.

Case No. 4:19-cv-00038-SLG, *Eyre v. The City of Fairbanks, et al.*
Order re Motion for Summary Judgment
Page 17 of 61

Case 4:19-cv-00038-SLG   Document 95   Filed 02/23/23   Page 17 of 61

seek help for their emotionally disturbed son."[102]  The Circuit emphasized that "we are aware of no published cases holding it reasonable to use a *significant* amount of force to try to stop someone from attempting suicide."[103]  The Circuit also acknowledged that although "[w]e do not rule out that in some circumstances some force might be warranted to prevent suicide," it would "be odd to permit officers to use force capable of causing serious injury or death in an effort to prevent the possibility that an individual might attempt to harm only himself."[104]

Defendants maintain that Eyre committed several crimes that evening because he waved a loaded firearm around while drunk and screamed and growled at the officers, including "the criminal offense of misconduct involving a weapon" and "assault in the third degree by placing others around him in fear of imminent serious physical injury."[105]  Indeed, the Ninth Circuit has held that a decedent who was experiencing a mental health crisis and refused to comply with numerous orders to stop and drop his sword, instead raising the sword and growling at officers, had committed "a crime" that "gave the deputies cause to believe that [the decedent] posed a threat of harm to whomever he

---

[102] *Glenn*, 673 F.3d at 874 (alteration omitted) (first quoting *Graham*, 490 U.S. at 396; and then citing *Deorle*, 272 F.3d at 1280–81 (noting that officers were called "not to arrest him, but to investigate his peculiar behavior [as] Deorle was clearly a deeply troubled, emotionally disturbed individual")).

[103] *Id.* at 872 (emphasis in original).

[104] *Id.*

[105] Docket 79 at 15.

Case No. 4:19-cv-00038-SLG, *Eyre v. The City of Fairbanks, et al.*
Order re Motion for Summary Judgment
Page 18 of 61

Case 4:19-cv-00038-SLG   Document 95   Filed 02/23/23   Page 18 of 61

encountered."[106]   The Court finds that, although officers were initially responding to a suicide threat—a type of call that would not ordinarily warrant the use of lethal force—Eyre's conduct escalated during the evening with respect to his engagement with the firearm.  This factor accordingly is neutral with respect to the reasonableness of the deployment of the lethal force.

The Court next considers whether Eyre was actively resisting arrest or attempting to evade arrest by flight.[107]  The Court finds that the responding officers did not attempt to arrest Eyre; however, he walked away from them and ignored numerous commands to drop his gun.  This factor is neutral.

Another factor that the Court considers is how quickly the responding officers resorted to using force after encountering Eyre.  Indeed, in one case, the Ninth Circuit held this was the "most important" factor in the Circuit's decision that excessive force may have been used because, viewing the facts in the light most favorable to the plaintiff, a police officer "escalated to deadly force very quickly" and shot at decedent "less than a minute" after the officer first came upon the decedent.[108]   In this case, the responding officers did not immediately resort to lethal force; instead they spent some time trying to talk to Eyre and deescalate the

---

[106] *Blanford v. Sacramento County*, 406 F.3d 1110, 1116 (9th Cir. 2005).

[107] *See Graham*, 490 U.S. at 396 (citing *Garner*, 471 U.S. at 8–9); *Lombardo*, 141 S. Ct. at 2241 (holding that courts should consider "whether the plaintiff was actively resisting" (quoting *Kingsley*, 576 U.S. at 397)).

[108] *A.K.H.*, 837 F.3d at 1012.

Case No. 4:19-cv-00038-SLG, *Eyre v. The City of Fairbanks, et al.*
Order re Motion for Summary Judgment
Page 19 of 61

Case 4:19-cv-00038-SLG   Document 95   Filed 02/23/23   Page 19 of 61

situation.[109]   Sweet said "we can talk about it," "we can help you," and reassured

Eyre that he was "all right."[110]   Thomas said "[w]e don't want to hurt you" and "[y]es,

you [will] live today."[111]     Listening to the body camera audio footage, the

responding officers yelled many commands at Eyre, like "drop the gun," but they

also spoke with him in a more calm manner when they tried to convince him to put

his gun down and talk with them.[112]   Eyre responded by swearing at the responding

officers and growling in distress.[113]     This factor supports a finding that the

responding officers' use of force was reasonable.

The Court also considers "whether there were less intrusive means of force

that might have been used before officers resorted to" lethal force.[114]   A police

officer is not required to use "the least intrusive means of responding to an exigent

situation"; instead, the officer "need only act within that range of conduct we identify

as reasonable."[115]     And yet in determining whether the use of force was

---

[109] It is not clear from the record how much time the responding officers spent trying to talk to Eyre before he was shot.  Relying on Larimer's body camera footage, approximately seven minutes passed between the moment when Larimer arrived at the Johansen-Steese intersection and the moment when Eyre was shot.  Docket 45-14 at 0:00–7:40.  Before Larimer arrived, other officers were already on the scene and interacting with Eyre.

[110] Docket 79-3 at 6.

[111] Docket 79-3 at 3.

[112] *See, e.g.*, Docket 45-14 at 0:00–7:40.

[113] Docket 79-2 at 4–5; Docket 79-3 at 1–7.

[114] *Glenn*, 673 F.3d at 876.  *See also Lombardo*, 141 S. Ct. at 2241 (holding that courts should consider "any effort made by the officer to temper or to limit the amount of force" (quoting *Kingsley*, 576 U.S. at 397)).

[115] *Henrich*, 39 F.3d at 915.

Case No. 4:19-cv-00038-SLG, *Eyre v. The City of Fairbanks, et al.*
Order re Motion for Summary Judgment
Page 20 of 61

Case 4:19-cv-00038-SLG   Document 95   Filed 02/23/23   Page 20 of 61

reasonable, a court may consider the availability of less intrusive alternatives to the force employed.[116] This is because police officers are "required to consider 'what other tactics if any were available.'"[117] "[I]f there were 'clear, reasonable and less intrusive alternatives' to the force employed, that 'militate[s] against finding [the] use of force reasonable.'"[118]

The evidence in the record suggests that the responding officers did not consider using less lethal alternatives. At one point, the dispatcher asked if the responding officers "ha[d] less lethal," but the response is "indiscernible."[119] Similarly, when Thomas was asked four days after the incident if "anyone talk[ed] about coming up with a . . . less lethal plan of any sort," Thomas said that "[n]obody spoke about that, and none of us had access to any of that," although he acknowledged that they had "OC and Tasers."[120] Larimer stated there was "[a]bsolutely . . . no" opportunity to "deploy[] . . . less lethal alternatives" because Eyre "was too far away."[121] Joslin said they "were way too far for a Taser to be

---

[116] *See Glenn*, 673 F.3d at 876.

[117] *Headwaters Forest Def. v. County of Humboldt*, 240 F.3d 1185, 1204 (9th Cir. 2000) (alterations omitted) (quoting *Chew v. Gates*, 27 F.3d 1432, 1443 (9th Cir. 1994)), *vacated on other grounds*, 534 U.S. 801 (2001).

[118] *Glenn*, 673 F.3d at 876 (quoting *Bryan v. MacPherson*, 630 F.3d 805, 831 (9th Cir. 2010)).

[119] Docket 79-2 at 7; Docket 79-8 at 13 (Joslin said "[s]omebody did ask if we had less lethal," but she did not "know what the response was.").

[120] Docket 79-6 at 22.

[121] Docket 79-9 at 22.

Case No. 4:19-cv-00038-SLG, *Eyre v. The City of Fairbanks, et al.*
Order re Motion for Summary Judgment
Page 21 of 61

Case 4:19-cv-00038-SLG   Document 95   Filed 02/23/23   Page 21 of 61

effective."[122]  And Elondre Johnson pointed out that he would not "put a trooper [with a Taser] at twenty-one feet with a guy with a gun, and not even some type of cover."[123]  He also said that "[p]epper spray is ineffective," presumably for the same reason.[124]  Joslin had a canine in the back of a patrol car, but said that the canine would not have been effective against a gun.[125]  James Thomas explained that "[Eyre] had the means of lethal force against us, so . . . our means of defense is lethal force."[126]

The Estate does not assert that any of these alternative means of less lethal force could have been employed.  Instead, the Estate maintains that the responding officers "separated [Eyre] from [his family,] the very people who could have . . . [told] him he was loved, important and there was much to live for."[127]  In a similar situation, however, another district court found that a mother's "evidence that she was not permitted to communicate with her son, despite her numerous requests to do so and her presence throughout the standoff" did "not produce[] evidence that the officers' decision not to adopt her proposed strategy, in itself, rendered their decision to use force unreasonable."[128]  The same is true here.

---

[122] Docket 79-8 at 13.

[123] Docket 79-7 at 15.

[124] Docket 79-7 at 15.

[125] Docket 79-8 at 13.

[126] Docket 79-6 at 22.

[127] Docket 83 at 17.

[128] *Alford v. Humboldt County*, 785 F. Supp. 2d 867, 878 (N.D. Cal. 2011).

Case No. 4:19-cv-00038-SLG, *Eyre v. The City of Fairbanks, et al.*
Order re Motion for Summary Judgment
Page 22 of 61

Before calling the dispatcher, Magdalena Eyre and her daughter tried to talk to Eyre, but he told them to "get the f*** away from me right now."[129]

The Estate also alleges that "[t]here were no efforts to reach out to community resources for help," such as mental health professionals. The Estate further contends that an armored vehicle was on its way and the responding officers should have "back[ed] off" and brought "in professionals within their own department with training," like "Crisis Intervention Training."[130] Indeed, the Ninth Circuit has provided that when responding to a mental health crisis, "the use of officers and others trained in the art of counseling is ordinarily advisable."[131] The Court does not suggest that the responding officers were required to attempt these less intrusive alternatives, but the availability of lesser alternatives that were not employed suggests that a reasonable jury could find that the deployment of lethal force in this case did not fall within the constitutionally permissible range of conduct.[132] In sum, although the Estate identified a few lesser alternatives to lethal force, the alternatives were limited, so this factor is neutral.

---

[129] Docket 79-1 at 9.

[130] Docket 83 at 16–17. Thomas confirmed at a deposition that an armored vehicle was on its way to the scene and that the officers intended "to wait behind that vehicle . . . as long as [Eyre] stayed there [and that they] were planning on waiting him out," but Eyre "didn't give [them] a chance to enact that plan because he pointed the gun at [them]." Docket 79-27 at 7–8.

[131] *Deorle*, 272 F.3d at 1283.

[132] *See Glenn*, 673 F.3d at 876.

Case No. 4:19-cv-00038-SLG, *Eyre v. The City of Fairbanks, et al.*
Order re Motion for Summary Judgment
Page 23 of 61

Next, the Court considers whether the responding officers recklessly created the danger that necessitated lethal force.[133]  The Ninth Circuit has held that when officers themselves "unnecessarily create their own sense of urgency," then "[r]easonable triers of fact can, taking the totality of the circumstances into account, conclude that an officer's poor judgment or lack of preparedness caused him or her to act unreasonably, 'with undue haste.'"[134]  This is because officers are "not simply responding to a preexisting situation" when the "officer[s] create[] the very emergency [they] then resort[] to deadly force to resolve."[135]

In *Nehad v. Browder*, for example, the Ninth Circuit considered whether an officer played a role in creating the danger to which the officer responded with lethal force.[136]  In that case, Officer Browder was responding to a call that Nehad had threatened someone with a knife.[137]  When Browder arrived at the scene, he

---

[133] *See Cunningham v. Gates*, 312 F.3d 1148, 1154 (9th Cir. 2002) (first citing *Alexander v. City of San Francisco*, 29 F.3d 1355 (9th Cir. 1994); then citing *Billington v. Smith*, 292 F.3d 1177, 1188–89 (9th Cir. 2002); and then citing *Allen v. Muskogee*, 119 F.3d 837, 840 (10th Cir. 1997)) (recognizing a "danger creation theory").  *See also Espinosa v. City & County of San Francisco*, 598 F.3d 528, 537 (9th Cir. 2010) ("The parties [sic] 'relative culpability' *i.e.*, which party created the dangerous situation and which party is more innocent, may also be considered.").

[134] *Nehad*, 929 F.3d at 1135 (alterations omitted) (quoting *Torres v. City of Madera*, 648 F.3d 1119, 1126 (9th Cir. 2011)).  *See also Lam v. City of San Jose*, 869 F.3d 1077, 1087 (9th Cir. 2017) ("Proper application of the reasonableness test requires careful attention to the facts and circumstances of each particular case," and "[t]he events leading up to the shooting, such as the officer's tactics, are encompassed in those facts and circumstances.") (citations and alterations omitted).

[135] *Porter v. Osborn*, 546 F.3d 1131, 1141 (9th Cir. 2008).  Although *Porter* involved a Fourteenth Amendment claim, the Ninth Circuit has applied this holding from *Porter* in the Fourth Amendment context.  *Nehad*, 929 F.3d at 1135 n.7.

[136] *Nehad*, 929 F.3d at 1134–35.

[137] *Id.* at 1130.

Case No. 4:19-cv-00038-SLG, *Eyre v. The City of Fairbanks, et al.*
Order re Motion for Summary Judgment
Page 24 of 61

Case 4:19-cv-00038-SLG   Document 95   Filed 02/23/23   Page 24 of 61

saw Nehad in a back alley walking in Browder's direction. Browder pulled into the alley, and then "drove his car several car lengths into the alley, opened his door, then drove further toward Nehad before exiting his vehicle." Browder did not identify himself as a police officer nor did he warn Nehad that he would use lethal force.[138] As Nehad continued to walk toward Browder at a steady pace, the officer "stepped out sideways from the protection of his vehicle door, closed the door, and, less than two seconds later, fired." An expert opined that Browder had "a lot of time" to decide how to respond to the situation, but "squandered all the opportunities tactically." The Ninth Circuit held that "a reasonable factfinder could conclude that any sense of urgency was of [the officer's] own making."[139]

The Estate contends that the responding officers here "precipitated the use of deadly force by their insistence to stay within 50 yards of Cody Eyre, with guns pointed in his direction" because "a reasonable jury could find those actions were reckless and precipitated the need to use deadly force."[140] Indeed, Elondre Johnson acknowledged that the responding officers did not give Eyre enough space, saying that they had "six people who don't train together" and "there's this urgency," so "at some point our proximity, I think it got you know . . . uncomfortably close, less than fifty yards."[141] And like the officer in *Nehad*, as the officers

---

[138] *Id.* at 1135.

[139] *Id.*

[140] Docket 83 at 18.

[141] Docket 79-7 at 9.

Case No. 4:19-cv-00038-SLG, *Eyre v. The City of Fairbanks, et al.*
Order re Motion for Summary Judgment
Page 25 of 61

Case 4:19-cv-00038-SLG   Document 95   Filed 02/23/23   Page 25 of 61

advanced here, they did not warn Eyre that they would use lethal force against him if he pointed his weapon at them or threatened to shoot them.[142]

Thomas observed that "once [Eyre] realize[d] . . . that this [wa]s kind of a cul-de-sac . . . , then he turn[ed] around again, [he yelled] at us, he t[ook] maybe one or two steps to the left . . . and then he brought the weapon down and he pointed it at at [sic] me, at us."[143] A reasonable jury could interpret this statement as suggesting that the situation escalated when Eyre realized that he was trapped in a cul-de-sac with six officers with their weapons drawn standing no more than 50 yards away. Thomas also acknowledged that they "were waiting on an armored vehicle or a BearCat to respond," because they hoped to "wait behind that vehicle and, as long as he stayed there, then [they] were planning on waiting him out." Thomas said "[w]e had EMS on the way to stage for that particular thing."[144] It is unclear why the officers remained within 50 yards of Eyre in a deserted cul-de-sac when they knew that an armored vehicle was on its way to provide them with protection.

The Estate also maintains that when the officers pursued Eyre in the deserted cul-de-sac, "[t]he only person at risk of being harmed by Cody was Cody himself until the officers decided to get within and stay within lethal range"[145] of his

---

[142] *Nehad*, 929 F.3d at 1135.

[143] Docket 79-6 at 15.

[144] Docket 79-27 at 7–8.

[145] Docket 83 at 10.

Case No. 4:19-cv-00038-SLG, *Eyre v. The City of Fairbanks, et al.*
Order re Motion for Summary Judgment
Page 26 of 61

Case 4:19-cv-00038-SLG   Document 95   Filed 02/23/23   Page 26 of 61

.22 Magnum revolver.[146]  Indeed, the body camera footage appears to indicate that Eyre was in a deserted street when the officers shot him.[147]  The closest residential area was also approximately 200 yards away.[148]  And to get to the residential area, Eyre would have had to traverse a three- to four-foot-tall berm of snow and then cross a "big field" of snow.[149]  The Estate maintains that a patrol car had been dispatched to the residential area in the event that Eyre attempted to cross that field of snow.[150]  And at a deposition that was taken six years after Eyre's death, in response to a question asking if Elondre Johnson "sen[t] anybody down to [the residential area] to sort of be on the other side in case [Eyre] kept walking and crossed the field after the cul-de-sac," Elondre Johnson said "I think somebody either headed over there or was supposed to go over there.  I can't recall."[151]

Viewing the facts in the light most favorable to the Estate, the Court finds that a reasonable factfinder could conclude that the responding officers acted recklessly by walking within 50 yards of an emotionally disturbed man with a loaded weapon who was not within shooting range of any nearby residents, thereby unnecessarily creating the sense of urgency and danger to the responding

---

[146] Docket 79-1 at 19.

[147] Docket 45-12; Docket 45-14.

[148] Docket 79-3 at 7.

[149] Docket 79-29 at 14; Docket 79-30 at 19.

[150] Docket 83 at 10.

[151] Docket 79-28 at 11.

Case No. 4:19-cv-00038-SLG, *Eyre v. The City of Fairbanks, et al.*
Order re Motion for Summary Judgment
Page 27 of 61

Case 4:19-cv-00038-SLG   Document 95   Filed 02/23/23   Page 27 of 61

officers' lives to which they responded with the use of lethal force in violation of the Fourth Amendment.

In considering this factor, the Court is not applying the "provocation rule," which the Supreme Court abrogated in *County of Los Angeles v. Mendez*.[152] The provocation rule imposed liability in excessive force cases "if (1) the officer intentionally or recklessly provoked a violent response, and (2) that provocation is an independent constitutional violation."[153] However, the Supreme Court in *Mendez* expressly declined to decide whether a jury may consider "unreasonable police conduct prior to the use of force that foreseeably created the need to use it."[154] The Supreme Court explained that "[a]ll we hold today is that *once* a use of force is deemed reasonable under *Graham*, it may not be found unreasonable by reference to some separate constitutional violation."[155] Indeed, subsequent to *Mendez*, both the Ninth and Tenth Circuits have held that a jury may consider unreasonable police conduct that creates the need to use lethal force.[156] And in

---

[152] *County of Los Angeles v. Mendez*, 581 U.S. 420, 426-31 (2017) (abrogating *Billington v. Smith*, 292 F.3d 1177 (9th Cir. 2002)); *see also Isayeva v. Sacramento Sheriff's Dep't*, 872 F.3d 938, 951 n.6 (9th Cir. 2017) ("The Supreme Court recently held that the Fourth Amendment provides no basis for [the provocation theory of liability].").

[153] *Mendez*, 581 U.S. at 426.

[154] *Mendez*, 581 U.S. at 429 n.*.

[155] *Id.* (emphasis in original).

[156] *See Winkler v. City of Phoenix*, 849 F. App'x 664, 667 (9th Cir. 2021) ("[T]he *Mendez* Court expressly declined to decide the argument raised . . .: namely, whether the jury may consider 'unreasonable police conduct prior to the use of force that foreseeably created the need to use it.' Given this court's longstanding endorsement of that factor, the district court's instruction precluding the jury from considering it was in error.") (first quoting *Mendez*, 581 U.S. at 429 n.*;

---

Case No. 4:19-cv-00038-SLG, *Eyre v. The City of Fairbanks, et al.*
Order re Motion for Summary Judgment
Page 28 of 61

Case 4:19-cv-00038-SLG   Document 95   Filed 02/23/23   Page 28 of 61

2021, the Supreme Court once again declined to decide this question, explaining "[w]e need not, and do not, decide . . . whether recklessly creating a situation that requires deadly force can itself violate the Fourth Amendment."[157]

The next factor that the Court considers is whether Eyre posed an immediate threat to the safety of the police officers or to others during the incident.[158] The Ninth Circuit has repeatedly emphasized that this factor is the most important.[159] Defendants contend that Eyre posed an immediate threat because he pointed his gun at the responding officers.[160] Indeed, Nathaniel Johnson, Elondre Johnson, Thomas, Joslin, Larimer, and Sweet each said at their depositions that Eyre had pointed his gun at them right before he was shot.[161] That being said, "in the deadly

---

then citing *Espinosa*, 598 F.3d at 537); *Est. of Ceballos v. Husk*, 919 F.3d 1204, 1214 n.2 (10th Cir. 2019) ("We recently reaffirmed this longstanding Tenth Circuit law, notwithstanding [the holding in *Mendez*].") (citing *Pauly v. White*, 874 F.3d 1197, 1219 n.7 (10th Cir. 2017)).

[157] *City of Tahlequah v. Bond*, 142 S. Ct. 9, 11 (2021).

[158] *See Graham*, 490 U.S. at 396 (citing *Garner*, 471 U.S. at 8–9); *Lombardo*, 141 S. Ct. at 2241 (holding that courts should consider "the severity of the security problem at issue" and the "threat reasonably perceived by the officer" (quoting *Kingsley*, 576 U.S. at 397)).

[159] *See, e.g.*, *S.B. v. County of San Diego*, 864 F.3d 1010, 1013 (9th Cir. 2017) ("Of all of these factors, the 'most important' one is 'whether the suspect posed an immediate threat to the safety of the officers or others.'" (quoting *George v. Morris*, 736 F.3d 829, 838 (9th Cir. 2013)).

[160] Docket 79 at 19–20.

[161] Nathaniel Johnson said "[s]o then when the actual shooting occurred, basically he pointed [the weapon] at our direction." Docket 79-5 at 16–17. James Thomas said "that's when he, he pointed the gun at us . . . . So uh, at that point um, I responded with a standard response, two rounds to the center mass of the target presented." Docket 79-6 at 16–17. Elondre Johnson said "I thought I saw . . . him pointing a gun at me . . . . [A]nd at that point that's when . . . I fired a round at him." Docket 79-7 at 12. Christine Joslin said "[s]o I saw the gun come at us," and then "we opened fire." Docket 79-8 at 14-15. Tyler Larimer said "he pointed it directly at us" and "at that time um, I decided to . . . fire my weapon . . . ." Docket 79-9 at 9. Richard Sweet said "[the pistol] was pointing right at . . . the Troopers" and so he "decided to shoot in defense of these guys." Docket 79-10 at 23.

Case No. 4:19-cv-00038-SLG, *Eyre v. The City of Fairbanks, et al.*
Order re Motion for Summary Judgment
Page 29 of 61

Case 4:19-cv-00038-SLG   Document 95   Filed 02/23/23   Page 29 of 61

force context, we cannot 'simply accept what may be a self-serving account by the police officer.'"[162]  This is "[b]ecause the person most likely to rebut the officers' version of events—the one killed—can't testify."[163]  The Court "must carefully examine all the evidence in the record . . . to determine whether the officer's story is internally consistent and consistent with other known facts."[164]

The Court has reviewed the footage from the body cameras that Sweet and Larimer were wearing on the night of Eyre's death.[165]  The Supreme Court has held that when a "videotape quite clearly contradicts the version of the story told by" one of the parties, a reviewing court should "view[] the facts in the light depicted by the videotape."[166]  Here, the videotapes from the night of Eyre's death do not shed any light on this Court's understanding of the facts of this case.  It is too dark and the video quality is too poor for the Court to determine whether Eyre pointed his gun at anyone.[167]

The Court has also considered the transcripts from the audio recordings that night.  Indeed, in *Long v. City and County of Honolulu*, the Ninth Circuit relied on

---

[162] *Cruz v. City of Anaheim*, 765 F.3d 1076, 1079 (9th Cir. 2014) (quoting *Henrich*, 39 F.3d at 915); *see also Long v. City and County of Honolulu*, 511 F.3d 901, 906 (9th Cir. 2007) ("We are mindful that we must be wary of self-serving accounts by police officers when the only non-police eyewitness is dead.").

[163] *Cruz*, 765 F.3d at 1079.

[164] *Henrich*, 39 F.3d at 915.

[165] Docket 45-12; Docket 45-14.

[166] *Scott v. Harris*, 550 U.S. 372, 378, 381 (2007).

[167] Docket 45-12 at 13:38–13:54; Docket 45-14 at 7:22–7:40.

Case No. 4:19-cv-00038-SLG, *Eyre v. The City of Fairbanks, et al.*
Order re Motion for Summary Judgment
Page 30 of 61

Case 4:19-cv-00038-SLG   Document 95   Filed 02/23/23   Page 30 of 61

"a CAD report that fairly accurately recorded the SWAT team's activities on the night of [the decedent's] death" to analyze the credibility of an officer's testimony that a decedent pointed a gun at law enforcement before the officer used lethal force.[168]  In that case, the CAD report recorded one of the officers saying "[s]hots fired. He just shoot [sic] at us" right before an officer shot and killed the decedent.[169]  The Circuit explained that "whether [the decedent] actually fired his rifle at these officers [was] . . . immaterial."  This was because the officer "had probable cause to believe that [the decedent] posed an immediate danger to these officers" when the officer "heard the radio transmission and observed [the decedent] point the rifle in the officers' direction."[170]  The Ninth Circuit accordingly affirmed the district court's grant of summary judgment, holding that the officer "acted in an objectively reasonable manner under the circumstances" and was entitled to qualified immunity.[171]

Similarly in this case, the transcripts from the audio recordings seem to confirm that Eyre aimed his gun at the responding officers.  Thomas is recorded as saying "[t]hat's at us" right before shots were fired.[172]  These facts strongly suggest that Eyre did point his weapon in the direction of the officers.  Moreover,

---

[168] *Long*, 511 F.3d at 906.

[169] *Id.* at 905.

[170] *Id.* at 906.

[171] *Id.* at 904.

[172] Docket 79-4 at 6; Docket 79-5 at 42.

Case No. 4:19-cv-00038-SLG, *Eyre v. The City of Fairbanks, et al.*
Order re Motion for Summary Judgment
Page 31 of 61

Case 4:19-cv-00038-SLG   Document 95   Filed 02/23/23   Page 31 of 61

all six of the officers standing in front of Eyre saw him point his gun in their direction and all six of them either shot at or attempted to shoot at Eyre.[173]  Accordingly, the officers' stories are "internally consistent and consistent with other known facts."[174] In the absence of any evidence to the contrary, the Court concludes that no reasonable jury could find that Eyre did not point his gun in the officers' direction immediately prior to the officers shooting their firearms.  At the very least, no reasonable jury could find that the responding officers did not reasonably believe that Eyre was pointing his gun in their direction.

In addition, Eyre carried a .22 Magnum revolver[175] throughout the entire evening; first in a holster on his hip, then in his hand, and at various points throughout the evening he waved the gun around and pointed it at his head.  Of course, "the fact that the 'suspect was armed with a deadly weapon' does *not* render the officers' response per se reasonable under the Fourth Amendment."[176] But "[t]his is not to say that the Fourth Amendment always requires officers to delay their fire until a suspect turns his weapon on them."[177]  Instead, if the person is armed, "a furtive movement, harrowing gesture, or serious verbal threat might

---

[173] *See supra* note 162.

[174] *Henrich*, 39 F.3d at 915 (citing *Hopkins v. Andaya*, 958 F.2d 881, 885–88 (9th Cir. 1992)).

[175] Docket 79-1 at 19.

[176] *George v. Morris*, 736 F.3d 829, 838 (9th Cir. 2013) (emphasis in original) (quoting *Glenn*, 673 F.3d at 872–73).

[177] *Id.*

Case No. 4:19-cv-00038-SLG, *Eyre v. The City of Fairbanks, et al.*
Order re Motion for Summary Judgment
Page 32 of 61

Case 4:19-cv-00038-SLG   Document 95   Filed 02/23/23   Page 32 of 61

create an immediate threat."[178]

For example, in *Blanford v. Sacramento County*, the Ninth Circuit affirmed the grant of summary judgment in favor of the defendants where the decedent, Blanford, made a harrowing gesture right before he was shot and killed.[179]  In the moments before he was shot, Blanford was "attempt[ing] to enter a private residence and backyard with a lethal weapon" and refused to drop the 2½ foot sword in his hand, instead "rais[ing] his sword and growl[ing]" at the officers.[180] The Ninth Circuit held that a deputy's decision to shoot the decedent in three separate volleys was a reasonable use of deadly force under the circumstances because Blanford "was armed with a dangerous weapon, was told to stop and drop it, was warned that he would be shot if he didn't comply, appeared to flaunt the deputies' commands by raising the sword and grunting, refused to let go of the sword, and was intent upon trying to get inside a private residence or its backyard with the sword in hand."[181]  The Circuit explained that the "deputies had cause to believe that Blanford posed a serious danger to themselves and to anyone in the house or yard that he was intent on accessing, because he failed to heed warnings

---

[178] *Id.* (affirming the denial of qualified immunity on summary judgment because officers shot a man on his balcony holding his walker in one hand and a gun with the barrel pointed down in the other, explaining that merely holding a weapon is insufficient, but that "a furtive movement, harrowing gesture, or serious verbal threat might create an immediate threat").

[179] 406 F.3d 1110, 1112 (9th Cir. 2005).

[180] *Id.* at 1116.

[181] *Id.* at 1119.

Case No. 4:19-cv-00038-SLG, *Eyre v. The City of Fairbanks, et al.*
Order re Motion for Summary Judgment
Page 33 of 61

Case 4:19-cv-00038-SLG   Document 95   Filed 02/23/23   Page 33 of 61

or commands and was armed with an edged weapon that he refused to put down."[182]

Similar to *Blanford*, Eyre made a harrowing gesture because he refused to drop his gun and growled at the officers despite numerous commands to drop the weapon and despite the responding officers' attempts to connect with Eyre and offer him help. And right before he was shot, Eyre yelled "[y]ou guys can f***ing die right now and I don't give a f***."[183] This is not a direct threat to shoot, but no reasonable jury could conclude that it was not a "serious verbal threat [that] might create an immediate threat,"[184] particularly because Eyre's previous verbal threats were all self-directed, saying things like "I will f***ing blow my head off."[185] When Eyre directed the threat to the responding officers, it was a "new action by [Eyre]" that "precipitated the use of" lethal force.[186]

An important difference, however, is that in *Blanford*, the immediate threat was not solely to the officers but potentially to others, as Blanford was "attempt[ing]

---

[182] *Id.* at 1116.

[183] Docket 79-3 at 8.

[184] *George*, 736 F.3d at 838. *See, e.g.*, *Gonzales v. City of Antioch*, 697 F. App'x 900, 901–02 (9th Cir. 2017) (citing *George* for the proposition that officers' use of force was reasonable as a matter of law where "responding officers were confronted with a suspect who had repeatedly threatened to kill a police officer and raised his gun in the direction of the officers").

[185] Docket 79-3 at 1.

[186] *Cf. Glenn*, 673 F.3d at 874 ("No new action by [the decedent] precipitated the use of less-lethal force.").

Case No. 4:19-cv-00038-SLG, *Eyre v. The City of Fairbanks, et al.*
Order re Motion for Summary Judgment
Page 34 of 61

Case 4:19-cv-00038-SLG   Document 95   Filed 02/23/23   Page 34 of 61

to enter a private residence and backyard with a lethal weapon."[187]  The Ninth Circuit concluded that "[w]hile it is true that the deputies did not know if anyone were at home or in the yard . . . it was objectively reasonable for them to be concerned for the safety of whoever was there, and for themselves."[188]  In this case by contrast, Eyre was walking down a deserted road when he was shot and killed.[189]  The closest residences were 200 yards away and separated by a field of snow.[190]  Viewing the facts in the light most favorable to the Estate, a reasonable jury could conclude that Eyre did not pose an immediate threat to the residents of the nearby apartment complex.

Another key difference between this case and *Blanford* is that the officers warned Blanford that they would use lethal force if he did not put down his sword.[191]  In this case, by contrast, there is no indication that the responding officers provided such a warning.  The Ninth Circuit recently emphasized the importance of this factor in *Smith v. Agdeppa*, observing that "[w]e have also repeatedly stated that an officer must give warning before using deadly force 'whenever practicable.'"[192]

---

[187] 406 F.3d at 1116.

[188] *Id.* at 1116–17.

[189] Docket 45-12 at 9:35–13:54.

[190] Docket 79-3 at 7; Docket 79-29 at 14; Docket 79-30 at 19.

[191] 406 F.3d at 1112–13.

[192] 56 F.4th 1193, 1201 (9th Cir. 2022) (quoting *Gonzalez v. City of Anaheim*, 747 F.3d 789, 794 (9th Cir. 2014) (en banc)).  This case was decided on December 30, 2022, after oral argument on the State's motion for summary judgment, which was held on July 22, 2022.

Case No. 4:19-cv-00038-SLG, *Eyre v. The City of Fairbanks, et al.*
Order re Motion for Summary Judgment
Page 35 of 61

Case 4:19-cv-00038-SLG   Document 95   Filed 02/23/23   Page 35 of 61

In *Agdeppa*, two officers were responding to a call from a Hollywood gym that a man named Albert Dorsey was "a little bit irate" and that he had "hurt[] a few members" and "assaulted security."[193]  When officers Rodriguez and Agdeppa arrived, they ordered Dorsey to leave the gym; but in response, he "ignored the officers, walked back and forth across the room to look at himself in the mirror, slowly dried his body with a towel, and danced to the music on his phone, raising his middle finger toward" one of the officers.[194]  The officers "attempted to handcuff [the] still-naked [decedent], who resisted the officers' attempts" to handcuff him.[195] What happened next is largely disputed, but according to the officers, Dorsey attacked them and their attempts to taser him made him more aggressive. According to Agdeppa, he "gave Dorsey a verbal warning, stating words to the effect that Dorsey needed to stop," but Dorsey "continued to pummel" Rodriguez on the ground, so Agdeppa shot and killed Dorsey.[196]  However, as the Ninth Circuit pointed out, Agdeppa's alleged warning cannot be heard on the audio from the body camera footage.[197]  In reversing summary judgment for the defendants, the Ninth Circuit acknowledged, "[i]t is uncontested that Dorsey posed some danger to the officers' safety by actively resisting arrest, but our case law required

---

[193] *Id.* at 1196.

[194] *Id.*

[195] *Id.*

[196] *Id.* at 1197.

[197] *Id.*

Case No. 4:19-cv-00038-SLG, *Eyre v. The City of Fairbanks, et al.*
Order re Motion for Summary Judgment
Page 36 of 61

Case 4:19-cv-00038-SLG   Document 95   Filed 02/23/23   Page 36 of 61

Agdeppa to give a deadly force warning if doing so was practicable."[198]  The Ninth Circuit pointed out that "Agdeppa never claimed that it was not practicable to give a deadly force warning," and to the contrary, "had time to yell 'stop.'"[199]  The Ninth Circuit held that "no warning, not even the 'stop' that Agdeppa alleges he yelled, can be heard on the officers' body-cam audio clips," so "[o]n that basis alone, a reasonable jury could find Agdeppa's use of deadly force was unreasonable and violated clearly established law."[200]

In this case, the responding officers repeatedly directed Eyre to "[p]ut the gun down" and "[s]top right there," and warned him that he "[could not] go into that residential area."[201]  As the Ninth Circuit pointed out, the fact that the responding officers had time to yell "stop" suggests that it may have been practicable for the responding officers to give a deadly force warning.[202]  But at no point did the officers warn Eyre that they would use deadly force against him if he pointed his weapon at them or threatened to shoot them.[203]  Indeed, the officers asserted he had pointed his gun at them earlier in the incident, but he apparently received no

---

[198] *Id.* at 1203 (first citing *Gonzalez*, 747 F.3d at 794; then citing *Harris v. Roderick*, 126 F.3d 1189, 1201, 1204 (9th Cir. 1997); and then citing *Est. of Lopez ex rel. Lopez v. Gelhaus*, 871 F.3d 998, 1011 (9th Cir. 2017)).

[199] *Id.* at 1204.

[200] *Id.*

[201] Docket 79-3 at 5–6.

[202] *See Agdeppa*, 56 F.4th at 1204.

[203] *See, e.g.*, Docket 79-3.

Case No. 4:19-cv-00038-SLG, *Eyre v. The City of Fairbanks, et al.*
Order re Motion for Summary Judgment
Page 37 of 61

Case 4:19-cv-00038-SLG   Document 95   Filed 02/23/23   Page 37 of 61

warning then.[204]   As in *Agdeppa*, a reasonable jury could conclude that "[t]here was ample time to give that order . . . and no reason whatsoever not to do so."[205]

Moreover, courts in this Circuit have concluded that "[m]ere commands, absent a statement that force will be used if the command is ignored, have not been found to constitute adequate warning."[206]   For example, in *Lehman v. Robinson*, taking the facts in the light most favorable to the plaintiff, the officers shot and killed a suicidal man armed with a knife "as he sat in his car, with all the tires shot out, surrounded by at least ten armed police officers and numerous police vehicles."[207]   When the decedent was "told to drop his knife and get back in his pickup truck, [he] partially obeyed, by reentering the vehicle, but not dropping the knife."[208]   Although the officers ordered the decedent to drop his knife and these orders went unheeded, the Ninth Circuit affirmed the denial of qualified immunity because the use of lethal force occurred "without any 'warning of the imminent use

---

[204] Docket 79-2 at 7; Docket 79-7 at 7, 21; Docket 79-8 at 3; Docket 79-10 at 4.

[205] *Deorle*, 272 F.3d at 1284.

[206] *Hulstedt v. City of Scottsdale*, 88 F. Supp. 2d 972, 992 (D. Ariz. 2012); *see also Est. of Carreno v. County of Santa Barbara*, Case No. 2:18-cv-3694-SK, 2020 WL 1172721, at *3 (C.D. Cal. Jan. 25, 2020) ("In addition, while Defendants ordered [the decedent] to drop the knife, they issued no explicit warnings that they would fire on him, which they did within three seconds of him stepping outside."); *but see Craig v. County of Santa Clara*, Case No. 17-CV-02115-LHK, 2018 WL 3777363, at *18 (N.D. Cal. Aug. 9, 2018) ("However, the Court finds that the officers' command to 'drop the gun' was sufficient warning in these circumstances."); *Krause v. County of Mohave*, 846 F. App'x 569, 570 (9th Cir 2021) ("We reject as unpersuasive Plaintiff's contention that [the defendant's] repeated orders to drop the gun provided insufficient warning to [the decedent] or that a more fulsome warning was practicable during the short duration of this event.").

[207] 228 F. App'x 697, 699 (9th Cir. 2007).

[208] *Id.*

Case No. 4:19-cv-00038-SLG, *Eyre v. The City of Fairbanks, et al.*
Order re Motion for Summary Judgment
Page 38 of 61

Case 4:19-cv-00038-SLG   Document 95   Filed 02/23/23   Page 38 of 61

of such a significant degree of force,' and was directed at a mentally disturbed individual who had 'committed no serious offense . . . .'"[209]

Similarly, in *Daniels v. County of Ventura*, the decedent was "a disturbed young man who had not threatened or harmed anyone," but he was outside of a swim school and, as the dissent pointed out, he "was armed with a weapon capable of causing serious injury and death."[210]  The dissent also stated that the decedent "had disobeyed every reasonable instruction shouted to him by the officers, including instructions to drop his weapon."[211]  The majority nonetheless affirmed the denial of qualified immunity, emphasizing that the officer "did not warn [the decedent] that he would shoot—only that he could not let [the decedent] 'go up' toward the swim school, a command that [the decedent] obeyed."[212]  The majority distinguished this case from *Blanford* because in *Blanford*, the "police shot a sword-wielding man who was attempting to enter a private residence, after warning him that they would shoot if he did not stop and drop the sword."[213]  These cases suggest that, although the responding officers repeatedly ordered Eyre to put down his gun, these orders were insufficient to warn him that they would use lethal force

---

[209] *Id.* at 700 (quoting *Deorle*, 272 F.3d at 1285–86).

[210] 228 F. App'x 669, 670–71 (9th Cir. 2007).

[211] *Id.* at 671.

[212] *Id.* at 670.

[213] *Id.* (citing *Blanford*, 406 F.3d at 1112–13).  *See* discussion *supra* pp. 33–35 for additional discussion of *Blanford*.

Case No. 4:19-cv-00038-SLG, *Eyre v. The City of Fairbanks, et al.*
Order re Motion for Summary Judgment
Page 39 of 61

Case 4:19-cv-00038-SLG   Document 95   Filed 02/23/23   Page 39 of 61

if he again turned the firearm in their direction.

Of course, "[t]he absence of a warning does not necessarily mean that [an officer's] use of deadly force was unreasonable."[214] However, the Ninth Circuit has reversed summary judgment for police officers where a "rational jury may find . . . a warning was practicable and the failure to give one might weigh against reasonableness."[215] In this case, the officers repeatedly ordered Eyre to drop his weapon, but they did not warn Eyre that they would use lethal force if he threatened to shoot them or pointed the firearm in their direction.[216] The Court accordingly concludes that a reasonable jury could find that it was practicable for the responding officers to give Eyre that warning and that they nonetheless failed to do so. This factor weighs against a finding of reasonableness.

## C. Objective Reasonableness

Having considered all of the factors that are relevant to this case, the Court assesses whether a reasonable jury could determine that the force used against Eyre was objectively unreasonable by balancing "the gravity of the intrusion on the individual against the government's need for that intrusion."[217] Viewing the facts in the light most favorable to Eyre, the Court concludes that "the evidence in the

---

[214] *Gonzalez*, 747 F.3d at 797 (citing *Harris*, 550 U.S. at 383).

[215] *Id.* (citing *Deorle*, 272 F.3d at 1283–94).

[216] Docket 45-14 at 0:00–7:40.

[217] *Miller v. Clark County*, 340 F.3d 959, 964 (9th Cir. 2003).

Case No. 4:19-cv-00038-SLG, *Eyre v. The City of Fairbanks, et al.*
Order re Motion for Summary Judgment
Page 40 of 61

Case 4:19-cv-00038-SLG   Document 95   Filed 02/23/23   Page 40 of 61

pretrial record [i]s sufficient to show a genuine issue of fact for trial."[218]  The Court

concludes that a reasonable jury could find that the use of lethal force in this case

violated Eyre's constitutional rights if that jury were to find that the responding

officers (1) failed to provide the appropriate warnings and (2) recklessly created a

situation that required the use of deadly force by remaining less than 50 yards from

Eyre in the cup-de-sac if the jury determines that he was not then an immediate

threat to anyone apart from those officers.

## D. Integral-Participant Doctrine

The Court must also consider whether Nathaniel Johnson may be held liable

for the alleged use of excessive force.  Although Nathaniel Johnson did attempt to

fire his weapon at the same moment that the other responding officers shot and

killed Eyre, his hands were too numb and he did not shoot.[219]  The defendants

contend that because Nathaniel Johnson did not personally use deadly force

against Eyre, he cannot be held liable to the Estate.[220]

"[A]n official whose 'individual actions' do 'not themselves rise to the level of

a constitutional violation' may be held liable under section 1983 only if the official

---

[218] *Peck v. Montoya*, 51 F.4th 877, 885 (9th Cir. 2022) (holding that the Ninth Circuit may not review any "portion of a district court's summary judgment order that, though entered in a 'qualified immunity' case, determines only a question of 'evidence sufficiency,' *i.e.*, which facts a party may, or may not, be able to prove at trial" (quoting *Johnson v. Jones*, 515 U.S. 304, 313 (1995))).

[219] Docket 79-5 at 16–17.

[220] Docket 79 at 24–27.

Case No. 4:19-cv-00038-SLG, *Eyre v. The City of Fairbanks, et al.*
Order re Motion for Summary Judgment
Page 41 of 61

Case 4:19-cv-00038-SLG   Document 95   Filed 02/23/23   Page 41 of 61

is an 'integral participant' in the unlawful act."[221] "Being a mere bystander [is] insufficient."[222] Accordingly, in *Hopkins v. Bonvicino*, the Ninth Circuit "held that an officer who stood in the front yard of a house interviewing witnesses while other officers carried out an unlawful search was not an integral participant in that search."[223] By contrast, "an officer who does not enter an apartment, but stands at the door, armed with his gun, while other officers conduct the search, can nevertheless be a 'full, active participant' in the search."[224]

Nathaniel Johnson was more than a "mere bystander." He was involved in the initial response to the 911 call, attempting to convince Eyre to get help and ordering Eyre to put down his weapon. Nathaniel Johnson was also one of the six officers who collectively formed a line across the road, pointed their weapons at Eyre, and advanced with Eyre while keeping a distance of no more than 50 yards from him. Importantly, Nathaniel Johnson had the intent to shoot Eyre at the same moment that the other five officers fired, but his "hands were extremely numb" and "[b]y the time [he] got [his] selector to fire . . . [Eyre ha]d taken enough rounds that

---

[221] *Peck*, 51 F.4th at 889 (quoting *Reynaga Hernandez v. Skinner*, 969 F.3d 930, 941 (9th Cir. 2020)). *Peck* was decided on October 18, 2022, after the Court held oral argument in this case on the State's motion for summary judgment on July 22, 2022.

[222] *Chuman v. Wright*, 76 F.3d 292, 294 (9th Cir. 1996) (citing *Melear v. Spears*, 862 F.2d 1177, 1186 (5th Cir. 1989)).

[223] *Peck*, 51 F.4th at 889 (citing *Hopkins v. Bonvicino*, 573 F.3d 752, 770 (9th Cir. 2009)).

[224] *Boyd v. Benton County*, 374 F.3d 773, 780 (9th Cir. 2004) (citing *Melear*, 862 F.2d at 1186).

Case No. 4:19-cv-00038-SLG, *Eyre v. The City of Fairbanks, et al.*
Order re Motion for Summary Judgment
Page 42 of 61

Case 4:19-cv-00038-SLG   Document 95   Filed 02/23/23   Page 42 of 61

there was no reason, in [his] mind, to shoot more."[225]

The Ninth Circuit recently held that the minimum level of involvement for liability under the integral-participant doctrine occurs in two situations:

> those in which (1) the defendant knows about and acquiesces in the constitutionally defective conduct as part of a common plan with those whose conduct constitutes the violation or (2) the defendant 'set[s] in motion a series of acts by others which [the defendant] knows or reasonably should know would cause others to inflict the constitutional injury.'[226]

With respect to the first category of liability, a "plan" is defined as "something that a person intends to do."[227]  The key word is "intent."  The Ninth Circuit has explained that "for an official to be liable for another actor's depriving a third party of his constitutional rights, that official must have at least the same level of intent as would be required if the official were directly to deprive the third party of his constitutional rights."[228]  In this case, Nathaniel Johnson had the exact same intent as the other five officers who shot and killed Eyre.  He also acted pursuant to a common plan with the shooting officers when he lined up alongside them with all six guns pointed at Eyre.

---

[225] Docket 79-5 at 17.

[226] *Peck*, 51 F.4th at 889 (alterations in original) (quoting *Johnson v. Duffy*, 588 F.2d 740, 743–44 (9th Cir. 1978)).

[227] THE BRITANNICA DICTIONARY, britannica.com/dictionary/plan (last visited Jan. 24, 2023).

[228] *Peck*, 51 F.4th at 890 (alterations omitted) (quoting *Lacey v. Maricopa County*, 693 F.3d 896, 916 (9th Cir. 2012)).

Case No. 4:19-cv-00038-SLG, *Eyre v. The City of Fairbanks, et al.*
Order re Motion for Summary Judgment
Page 43 of 61

It is Nathaniel Johnson's intent to shoot Eyre that distinguishes this case from *Peck v. Montoya*.[229]  In that case, five deputies responded to a 911 call reporting that a man was threatening someone with a firearm.  When the deputies arrived on the scene, they established a perimeter around the house.  Although the parties disputed what happened next, according to the deputies, the decedent grabbed his gun and raised it toward the deputies, at which point he was shot and killed by two of the deputies.  The other three deputies on the scene did not fire their weapons.  There were no facts suggesting that the three deputies had any intent to shoot the decedent.[230]  With respect to these three deputies, the Ninth Circuit reversed the denial of summary judgment on the excessive force claim. The Circuit explained that the three deputies did not "have any reason to know that their actions—providing armed backup—would enable the later use of excessive force."[231]  By contrast, Nathaniel Johnson had the intent to shoot Eyre. Accordingly, defendants' motion for summary judgment as to Nathaniel Johnson based on the claim that he was not an integral participant is denied.

## II.    Clearly Established Law

The Court next addresses whether the law was clearly established at the time of the alleged constitutional violation such that a reasonable officer then would

---

[229] 51 F.4th 877.

[230] *Id.* at 882–84.

[231] *Id.* at 891 (emphasis in original).

Case No. 4:19-cv-00038-SLG, *Eyre v. The City of Fairbanks, et al.*
Order re Motion for Summary Judgment
Page 44 of 61

Case 4:19-cv-00038-SLG   Document 95   Filed 02/23/23   Page 44 of 61

have known that the use of lethal force against Eyre in these circumstances could violate Eyre's constitutional right to be free from the use of excessive force. The Supreme Court has held that "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right."[232] While there need not be "a case directly on point, . . . existing precedent must have placed the statutory or constitutional question beyond debate."[233]

To determine whether the law is clearly established for purposes of qualified immunity, a court looks to judicial decisions issued prior to the date of the alleged violation.[234] A court in this Circuit looks first to binding precedent issued by the Supreme Court and the Ninth Circuit.[235] "'In the absence of binding precedent, a court should look to whatever decisional law is available to ascertain whether the law is clearly established' for qualified immunity purposes, 'including decisions of state courts, other circuits, and district courts.'"[236] The Court therefore looks to judicial decisions issued prior to December 24, 2017, the date of this incident.

First, it was then well-established that the failure to give a warning when

---

[232] *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).

[233] *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (citing *Creighton*, 483 U.S. at 640).

[234] *See Ballentine v. Tucker*, 28 F.4th 54, 64 (9th Cir. 2022).

[235] *Boyd*, 374 F.3d at 781 ("In the Ninth Circuit, we begin our inquiry by looking to binding precedent. If the right is clearly established by decisional authority of the Supreme Court or this Circuit, our inquiry should come to an end." (citations omitted)).

[236] *Drummond ex rel. Drummond v. City of Anaheim*, 343 F.3d 1052, 1060 (9th Cir. 2003) (alterations omitted) (quoting *Malik v. Brown*, 71 F.3d 724, 727 (9th Cir. 1995)).

Case No. 4:19-cv-00038-SLG, *Eyre v. The City of Fairbanks, et al.*
Order re Motion for Summary Judgment
Page 45 of 61

Case 4:19-cv-00038-SLG   Document 95   Filed 02/23/23   Page 45 of 61

practicable might weigh against reasonableness.[237]  For example, in 2014, the Ninth Circuit sitting en banc in *Gonzalez v. City of Anaheim* reversed summary judgment for the defendants, explaining that "[i]n general, we have recognized that an officer must give a warning before using deadly force 'whenever practicable.'"[238] In that case, Gonzalez was shot and killed by a police officer during a traffic stop. According to the responding officers, Gonzalez refused their commands to turn off his vehicle and open his hands, which he held clenched in his lap.  The officers believed Gonzalez had something in his hands, so one of them began striking Gonzalez with a flashlight and the other entered the vehicle through the passenger side and punched Gonzalez in the head.  During the struggle, Gonzalez managed to shift the vehicle into drive and it began moving forward.  According to the officer in the vehicle, Gonzalez stomped on the accelerator and, after trying to get control of the car, the officer shot Gonzalez in the head and killed him.[239]  The Ninth Circuit reversed summary judgment for two primary reasons.  The first was that the officers' testimony was internally inconsistent, so there was a genuine issue of

---

[237] *Gonzalez*, 747 F.3d at 797 (decided in 2014); *see also Roderick*, 126 F.3d at 1204 ("Whenever practicable, a warning must be given so that the suspect may end his resistance . . . .") (decided in 1997); *Est. of Lopez*, 871 F.3d at 1011 (holding that an officer's use of deadly force was unreasonable because the officer "indisputably had time to issue a warning, but never notified [the decedent] that he would be fired upon if he either turned or failed to drop the gun") (decided on September 22, 2017).

[238] *Gonzalez*, 747 F.3d at 794 (quoting *Roderick*, 126 F.3d at 1201 (9th Cir. 1997)).

[239] *Id.* at 792–93.

Case No. 4:19-cv-00038-SLG, *Eyre v. The City of Fairbanks, et al.*
Order re Motion for Summary Judgment
Page 46 of 61

Case 4:19-cv-00038-SLG   Document 95   Filed 02/23/23   Page 46 of 61

material fact as to the speed of the vehicle when Gonzalez was shot.[240]  This precluded summary judgment because the speed of the vehicle would determine whether Gonzalez presented an immediate threat to safety that would justify the use of deadly force.[241]  The Ninth Circuit also concluded that a jury could "find that [the officer] failed to give a warning before he shot Gonzalez in the head" and that "if the car was moving at an average speed of 3 to 7 miles per hour, a warning was practicable and the failure to give one might weigh against reasonableness."[242] The Ninth Circuit recently cited to the *Gonzalez* decision from 2014 for the proposition that "[w]e have . . . repeatedly stated that an officer must give warning before using deadly force 'whenever practicable.'"[243]  The *Gonzalez* decision put the responding officers in this case on notice that their failure to warn Eyre that they would use lethal force against him would weigh against reasonableness if a jury found that such a warning was practicable.

 In addition to *Gonzalez*, a case decided in 2016 by the United States District Court for the Northern District of California involving facts that were quite similar to the case at hand, addressed the need for a warning on the use of lethal force when

---

[240] *Id*. at 794.

[241] *Id*. at 795–96.

[242] *Id*. at 797.

[243] *Agdeppa*, 56 F.4th at 1201 (quoting *Gonzalez*, 747 F.3d at 794).

Case No. 4:19-cv-00038-SLG, *Eyre v. The City of Fairbanks, et al.*
Order re Motion for Summary Judgment
Page 47 of 61

practicable.[244]  In *Pimental v. City of Hayward*, the district court denied in part the defendants' motion for summary judgment because, among other reasons, there was a question of fact as to whether the responding officer adequately warned the decedent that he would use lethal force against her if she did not drop her gun.[245] In that case, similar to this one, the officer was performing a welfare check; the decedent suffered from severe depression and had been calling the police agency repeatedly.[246]  According to the responding officers' declarations, the decedent exited her apartment with a gun in her hand and they issued several commands to "drop the gun," warning her that they would shoot if she did not drop her weapon. The officers' declarations stated the decedent disregarded their commands and walked down the stairs towards them with the gun.  When she was about ten yards away from the officers, both officers in their declarations stated that she lifted her gun and aimed it at the officers, whereupon one of the officers fired four rounds at her, killing her.[247]  An investigation after the incident revealed that the decedent had written a suicide note and that the gun in her hand was only a "direct replica of a real gun that was capable of shooting pellets."[248]  There were four witnesses who saw the events unfold; of these, one witness said that she did not see a

---

[244] District court decisions are clearly established law for purposes of the qualified immunity analysis.  *See Drummond*, 343 F.3d at 1060 (9th Cir. 2003).

[245] Case No. 14-cv-04706-JCS, 2016 WL 5930577, at *10 (N.D. Cal. Oct. 12, 2016).

[246] *Id.* at *1.

[247] *Id.* at *2–4.

[248] *Id.* at *5.

Case No. 4:19-cv-00038-SLG, *Eyre v. The City of Fairbanks, et al.*
Order re Motion for Summary Judgment
Page 48 of 61

Case 4:19-cv-00038-SLG   Document 95   Filed 02/23/23   Page 48 of 61

weapon in the decedent's hands when she was shot.[249]  The district court
accordingly found that there was a question of fact as to whether the decedent had
the gun in her hand when she was shot and, if so, whether she pointed her weapon
at the officers before they shot her, or "simply wav[ed] it around wildly."[250]

With respect to the failure to warn, the district court quoted the Supreme
Court's 1985 opinion in *Tennessee v. Garner* for the proposition that "where
feasible, some warning has [to be] given" before an officer may use deadly force
against someone who "threatens the officer with a weapon."[251]  The district court
also observed that some of the witnesses testified that they did not hear the officers
issue any commands or warnings.[252]  Because it was clearly established in 2016
that an officer must, when feasible, provide a warning before using lethal force and
because "there [we]re fact questions as to whether [the decedent] was warned and
regarding the adequacy of those warnings," the district court concluded that
"summary judgment on the question of qualified immunity [was] not warranted."[253]
In addition to *Gonzalez,* the decision in *Pimental* put the responding officers in this
case on notice that an officer's use of lethal force when performing a welfare check
on a suicidal individual carrying a gun could be unconstitutional if the officer failed

---

[249] *Id.* at *7.

[250] *Id.* at *10.

[251] *Id.* at *9 (quoting *Garner*, 471 U.S. at 11).

[252] *Id.* at *4, *7.

[253] *Id.* at *10–11.

Case No. 4:19-cv-00038-SLG, *Eyre v. The City of Fairbanks, et al.*
Order re Motion for Summary Judgment
Page 49 of 61

Case 4:19-cv-00038-SLG   Document 95   Filed 02/23/23   Page 49 of 61

to provide adequate warnings before using lethal force.

The law was also clearly established at the time of this incident that an officers' actions may violate the Fourth Amendment if the officer played a role in creating the dangerous situation that required lethal force.[254]  For example, on September 5, 2017, in *Lam v. City of San Jose*, the Ninth Circuit addressed whether a jury could consider an officer's "bad tactics" leading up to the use of lethal force against a suicidal man holding a knife.[255]  Police were called because the decedent, who had just been released from an involuntary psychiatric hold at a hospital, was behaving erratically, believing someone was in his house, and threatening to cut himself with a knife.  According to one witness, when the responding officer arrived, the decedent was in the middle of his lawn and the officer walked up to the decedent until she was approximately 10 to 15 feet away from him with her gun pointed at the decedent.  Then the decedent turned his back on the officer and "started making motions with the knife toward his stomach, as if he were stabbing himself" and the officer "immediately" shot him in the back.  But according to the officer, as she approached the decedent, he walked towards her with his knife and she shot at him when he was approximately 10 feet away, but she missed.  According to the officer, the decedent then turned around and started

---

[254] *See, e.g.*, *Espinosa*, 598 F.3d at 537 (decided in 2010); *Torres*, 648 F.3d at 1126–27 (decided in 2011).

[255] 869 F.3d 1077 (9th Cir. 2017).

Case No. 4:19-cv-00038-SLG, *Eyre v. The City of Fairbanks, et al.*
Order re Motion for Summary Judgment
Page 50 of 61

Case 4:19-cv-00038-SLG   Document 95   Filed 02/23/23   Page 50 of 61

walking backwards toward her, at which point the officer fired again and hit him in the back.[256]

A jury unanimously found that the officer had used unreasonable force and that the officer was 65% at fault for the fatal shooting. On appeal, the Ninth Circuit affirmed the denial of the defense motion for a new trial.[257] The Circuit rejected the defendants' argument that "the district court erred by failing to [instruct] . . . the jury that Fourth Amendment liability cannot be premised solely on an officer's 'bad tactics.'"[258] The Circuit explained that the Fourth Amendment reasonableness test requires consideration of the "facts and circumstances of each particular case," and that "[t]he events leading up to the shooting, such as the officer's tactics, are encompassed in those facts and circumstances."[259] The Ninth Circuit's decision in *Lam* accordingly put the responding officers in this case on notice that a police officer may violate the Constitution when responding to a call about someone who is armed and experiencing a mental health crisis if the officer uses "bad tactics" that play a role in creating the danger to which the officer responds with lethal force.

In sum, a review of the decisional law before December 24, 2017, indicates

---

[256] *Id.* at 1081–83.

[257] *Id.* at 1084.

[258] *Id.* at 1087.

[259] *Id.*

Case No. 4:19-cv-00038-SLG, *Eyre v. The City of Fairbanks, et al.*
Order re Motion for Summary Judgment
Page 51 of 61

Case 4:19-cv-00038-SLG   Document 95   Filed 02/23/23   Page 51 of 61

that the law was clearly established such that a reasonable officer would have known that the use of lethal force in the cul-de-sac could violate Eyre's Fourth Amendment rights.

### III. Failure to Intervene

The defendants contend that "each of the officers is entitled to summary judgment on the Estate's 42 U.S.C. § 1983 claim based on a theory of failure-to-intervene."[260] To the extent that the Complaint may have alleged such a theory of liability, the Estate's opposition to the motion for summary judgment failed to respond to the defendants' arguments.[261] By failing to respond, the Estate has not even attempted to demonstrate "specific facts showing that there is a genuine issue for trial" on this claim.[262] Moreover, it is well-established that "officers can be held liable for failing to intercede only if they had an opportunity to intercede."[263] For example, the Ninth Circuit has held that "non-shooting officers who were present at [a] shootout[] had no 'realistic opportunity' to intercede."[264] In this case, the body cameras show that the responding officers shot Eyre instantly after Eyre

---

[260] Docket 79 at 30.

[261] The Complaint did not bring any claim premised on the defendants' failure to intervene; instead, the Complaint briefly mentions a failure to intervene in passing. Docket 1 at 8, ¶ 36, 14–15 at ¶¶ 73, 76. The Estate's opposition did not mention this theory of liability. Docket 83.

[262] *Celotex*, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)).

[263] *Cunningham v. Gates*, 229 F.3d 1271, 1289 (9th Cir. 2000).

[264] *Id.* at 1290.

Case No. 4:19-cv-00038-SLG, *Eyre v. The City of Fairbanks, et al.*
Order re Motion for Summary Judgment
Page 52 of 61

Case 4:19-cv-00038-SLG   Document 95   Filed 02/23/23   Page 52 of 61

yelled "[y]ou guys can f***ing die right now and I don't give a f***."[265]  "[V]iew[ing] the facts in the light depicted by the videotape," the Court concludes that there was no opportunity for intervention in the moment before the officers shot Eyre.[266] Accordingly, there can be no liability for a constitutional violation based on a failure-to-intervene theory.[267]

## IV. Disability Discrimination under the Americans with Disabilities Act and the Rehabilitation Act

The Estate alleges that the defendants violated Title II of the Americans with Disabilities Act ("ADA")[268] by "failing to make reasonable accommodations to address [Eyre's] mental illness" and "by failing to train its employees to make reasonable accommodations to serve persons with mental health disabilities."[269] The Complaint brings similar allegations pursuant to Section 504 of the Rehabilitation Act ("RA").[270]  The ADA and the RA both prohibit discrimination on the basis of disability in the programs, services, or activities of a public

---

[265] Docket 45-12 at 13:38–13:54; Docket 45-14 at 7:22–7:40.

[266] *Harris*, 550 U.S. at 381.

[267] To the extent that the Estate may have alleged that the City of Fairbanks is liable under § 1983 for the officers' excessive force based on a failure to train, *see* Docket 1 at 8–9, ¶ 39, the Court does not reach this claim because neither party sufficiently briefed the issue and the record is insufficiently developed. *Cf. Armster v. U.S. Dist. Ct. for the Cent. Dist. of Cal.*, 792 F.2d 1423, 1427 (9th Cir. 1986) (declining to reach statutory questions where "the legal issues involved ha[d] not been adequately briefed or argued by either party, and the record lack[ed] certain facts that might be necessary to a proper resolution of those questions" (footnotes omitted)).

[268] 42 U.S.C. § 12101, *et seq.*

[269] Docket 1 at 12–13 ¶¶ 59, 62.

[270] Docket 1 at 13–14 ¶¶ 65–69.  Section 504 of the Rehabilitation Act of 1973, as amended, is codified at 29 U.S.C. § 794(a).

Case No. 4:19-cv-00038-SLG, *Eyre v. The City of Fairbanks, et al.*
Order re Motion for Summary Judgment
Page 53 of 61

entity. There is "no significant difference" between the ADA and the RA; nor do they require separate analyses.[271] The Court will accordingly analyze Eyre's ADA and RA claims together.

As a preliminary matter, the Court must decide whether the ADA applies to police officers' performance of a welfare check. The Ninth Circuit has joined the majority of circuits in holding that the ADA applies when the police effectuate an arrest.[272] This is because "[t]he ADA applies broadly to police 'services, programs, or activities,'" and the Ninth Circuit has "interpreted these terms to encompass 'anything a public entity does,'" including effectuating an arrest.[273] This same logic extends to a welfare check because it is an "activity" that "a public entity does." Moreover, although the Ninth Circuit in *Sheehan* ultimately held that "Title II applies to arrests," the police were originally called in that case to perform a welfare check.[274]

But while the Estate properly brings its excessive force claim against the individual defendants, there is no liability for individual defendants under the ADA

---

[271] *Vinson v. Thomas*, 288 F.3d 1145, 1152 n.7 (9th Cir. 2002).

[272] *Sheehan v. City and County of San Francisco*, 743 F.3d 1211, 1231–33 (9th Cir. 2014), *rev'd on other grounds*, 575 U.S. 600 (2015).

[273] *Id.* at 1232 (first quoting 42 U.S.C. § 12132; and then quoting *Barden v. City of Sacramento*, 292 F.3d 1073, 1076 (9th Cir. 2002)).

[274] *Id.* at 1217, 1232. *See also Vos v. City of Newport Beach*, 892 F.3d 1024, 1036 (9th Cir. 2018) ("In *Sheehan I*, officers responded to a call at a group home to perform a welfare check on a mentally ill woman . . . .").

Case No. 4:19-cv-00038-SLG, *Eyre v. The City of Fairbanks, et al.*
Order re Motion for Summary Judgment
Page 54 of 61

Case 4:19-cv-00038-SLG   Document 95   Filed 02/23/23   Page 54 of 61

or the RA.[275]  Instead, the proper defendant in a disability discrimination action is the public entity responsible for the alleged discrimination—in this case, the State of Alaska and the City of Fairbanks.[276]  To the extent the Estate brings ADA and RA claims against the individual defendants, these claims fail as a matter of law.[277]

> To state a claim under Title II of the ADA, a plaintiff must allege:
>
> (1) he is an individual with a disability; (2) he is otherwise qualified to participate in or receive the benefit of a public entity's services, programs, or activities; (3) he was either excluded from participation in or denied the benefits of the public entity's services, programs, or activities, or was otherwise discriminated against by the public entity; and (4) such exclusion, denial of benefits, or discrimination was by reason of his disability.[278]

As to the first factor, the Estate has not satisfied its burden at the summary judgment stage to present specific facts showing that there is a genuine issue for trial as to whether Eyre had a disability as defined by the ADA.  The ADA defines "disability" in relevant part as "a physical or mental impairment that substantially limits one or more major life activities of [an] individual."[279]  The ADA and RA claims

---

[275] *Vinson*, 288 F.3d at 1156 ("We therefore join the Fifth, Eighth, and Eleventh Circuits and hold that a plaintiff cannot bring an action under 42 U.S.C. § 1983 against a State official in her individual capacity to vindicate rights created by Title II of the ADA or section 504 of the Rehabilitation Act.").

[276] *United States v. Georgia*, 546 U.S. 151 (2006) (holding that Title II of the ADA validly abrogates State sovereign immunity insofar as it creates a private cause of action for damages against the States for conduct that actually violates the Fourteenth Amendment).

[277] Docket 1 at 12–13, ¶¶ 60, 69.

[278] *Vos*, 892 F.3d at 1036 (alterations omitted) (quoting *Sheehan*, 743 F.3d at 1232).

[279] 42 U.S.C. § 12102(1)(A).

Case No. 4:19-cv-00038-SLG, *Eyre v. The City of Fairbanks, et al.*
Order re Motion for Summary Judgment
Page 55 of 61

Case 4:19-cv-00038-SLG   Document 95   Filed 02/23/23   Page 55 of 61

in the Complaint make only a vague reference to Eyre's "mental illness."[280]  The

opposition to the motion for summary judgment is more specific, as it asserts that

Eyre suffered from depression and suicidal ideation.[281]  The Ninth Circuit has

recognized that depression may be a disability under the ADA.[282]  For example, in

*Snead v. Metropolitan Property & Casualty Insurance Co.*, the Ninth Circuit held

that a plaintiff had submitted sufficient evidence to raise an issue of fact as to

whether she had a recognized impairment for purposes of the ADA and Oregon

law where the plaintiff's "physician wrote that her stress and depression rendered

her 'medically' disabled" and "an independent medical examiner . . . found that

[she] suffered from ' . . . Depression.'"[283]  The Circuit added that the plaintiff had

demonstrated a genuine issue of material fact as to whether her mental impairment

substantially limited her major life activities by submitting evidence that "[h]er

doctor wrote that she needed leave because she was 'medically disabled by stress

and depression'" and that she "did not work at all for nearly two years."[284]

In this case, by contrast, the Estate does not point to any evidence in the

record to show that Eyre suffered from depression or that his depression limited

his major life activities.  Instead, the Estate asserts "[t]here can be little question

---

[280] Docket 1 at 11–14, ¶¶ 54–69.

[281] Docket 83 at 20.

[282] *Snead v. Metro. Prop. & Cas. Ins. Co.*, 237 F.3d 1080, 1088 (9th Cir. 2001).

[283] *Id.*

[284] *Id.* at 1089.

Case No. 4:19-cv-00038-SLG, *Eyre v. The City of Fairbanks, et al.*
Order re Motion for Summary Judgment
Page 56 of 61

Case 4:19-cv-00038-SLG   Document 95   Filed 02/23/23   Page 56 of 61

that Cody Eyre's depression (and suicidal ideation) was so severe that it was substantially limiting in his ability to perform the function of daily living."[285] Such conclusory statements are insufficient to survive a motion for summary judgment.[286] And the Estate contends for the first time in its opposition to the motion for summary judgment that Eyre "called earlier in the month to the suicide hotline" and was "discharged from the military because of disabling ADHD," but again the Estate points to no evidence in the record to support these statements.[287]

And although it is clear from the events that transpired on December 24, 2017, that Eyre was suicidal on the night of his death, the Estate has not pointed to any case law suggesting that one occasion of suicidality is sufficient to establish disability for purposes of the ADA. By contrast, the defendants have identified numerous district court orders to support its assertion that "[t]he vast majority of suicide-based ADA cases involve undisputed and independently-established disabilities, or otherwise tend to indicate that suicidal tendencies do not generate

---

[285] Docket 83 at 20.

[286] *See Arpin v. Santa Clara Valley Transp. Agency*, 261 F.3d 912, 922 (9th Cir. 2001) ("[C]onclusory allegations unsupported by factual data are insufficient to defeat . . . [a] summary judgment motion.").

[287] Docket 83 at 21. *See* Fed. R. Civ. P. 56(c)(1)(A) ("A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials.").

Case No. 4:19-cv-00038-SLG, *Eyre v. The City of Fairbanks, et al.*
Order re Motion for Summary Judgment
Page 57 of 61

ADA-qualifying disabilities."[288]

Turning to the remaining factors, even if Eyre's suicidality on the night of his death were sufficient to establish disability for purposes of the ADA, the Estate has not produced sufficient evidence to show that he was denied services or faced discrimination based on his disability. The Complaint alleges that the defendants violated the ADA by denying Eyre "emergency services and other appropriate assistance from EMTs and police officers."[289] The Ninth Circuit has emphasized, however, that "[t]he ADA prohibits discrimination because of disability, not inadequate treatment for disability," such that the Estate's contentions that the defendants should have provided emergency assistance are not cognizable under the ADA.[290] Moreover, the opposition did not meaningfully address whether Eyre was denied services or faced discrimination based on his disability; instead the opposition addressed whether Eyre had a disability for purposes of the ADA and

---

[288] *Garza v. City of Donna*, Case No. 7:16-CV-00558, 2017 WL 2861456, at *8 n.108 (S.D. Tex. July 5, 2017) (collecting cases). *See also Sanders v. Arneson Prods., Inc.*, 91 F.3d 1351, 1354 (9th Cir. 1996) (holding that a "temporary psychological impairment, from December 19, 1992 to April 5, 1993, with no residual effects after April 5, 1993, was not of sufficient duration to fall within the protections of the ADA as a disability") (collecting cases finding that temporary injury, including temporary mental depression, do not support a claim under the ADA); *but see Munoz v. Cal. Dep't of Corr. & Rehab.*, Case No. 1:16-cv-01103 JLT BAK (BAM), 2022 WL 183494, at *7 (E.D. Cal. Jan. 20, 2022) (explaining that *Sanders* was decided prior to the ADA's amendment in 2008, which "broadened the definition of 'disability'").

[289] Docket 1 at 12, ¶ 57. *See also* Docket 1 at 12–13, ¶¶ 60, 63 (alleging that defendants failed "to make reasonable accommodations to provide appropriate medical assistance rather than resort to deadly violence").

[290] *Simmons v. Navajo County*, 609 F.3d 1011, 1022 (9th Cir. 2010), *overruled on other grounds by Castro v. County of Los Angeles*, 833 F.3d 1060 (9th Cir. 2016) (en banc).

Case No. 4:19-cv-00038-SLG, *Eyre v. The City of Fairbanks, et al.*
Order re Motion for Summary Judgment
Page 58 of 61

whether the State of Alaska receives RA monies.[291] For the foregoing reasons, the Court grants summary judgment to the defendants on the ADA and RA claims.

## V. State Law Claims

The Estate's Complaint also alleges the following violations of state law: common law negligence, negligent failure to train and supervise, wrongful death, and assault and battery.[292] The defendants contend that the assault and battery claims and the negligence claims all "fail as a matter of law for the same reasons its excessive force claims fail—each officer's actions w[as] reasonable and conformed to the standards required of them under the circumstances."[293] The Court will not grant summary judgment on this basis with respect to the state law claims because, as discussed above, the Court concludes that a jury could find that the defendants acted unreasonably in a manner that violated Eyre's Fourth Amendment right to be free from excessive force and that the law was clearly established in this regard.

That being said, the Estate's opposition to summary judgment does not cite to any law to support its state law claims, arguing generally that "a reasonable jury could conclude that the officers' actions were not objectively reasonable."[294] The

---

[291] *See* Docket 83 at 20–22.

[292] Docket 1 at 9–11, ¶¶ 41–50; 14–16, ¶¶ 70–82.

[293] Docket 79 at 43–47.

[294] Docket 83 at 22–23.

Case No. 4:19-cv-00038-SLG, *Eyre v. The City of Fairbanks, et al.*
Order re Motion for Summary Judgment
Page 59 of 61

Court finds the state law claims are inadequately briefed to warrant summary judgment.[295] In particular, neither party has addressed whether the defendants are entitled to immunity under state law for the alleged violations of common law rights pursuant to the test laid out by the Alaska Supreme Court in *Aspen Exploration Corp. v. Sheffield* and its progeny.[296]

## CONCLUSION

In light of the foregoing, IT IS ORDERED that defendants State and ASTs Elondre Johnson, Nathaniel Johnson, James Thomas III, and Christine Joslin's Motion for Summary Judgment at Docket 78, joined by the remaining defendants at Dockets 80 and 82, is DENIED in part and GRANTED in part as follows:

- Summary judgment is GRANTED to all defendants with respect to the claims brought pursuant to the ADA and the RA;

- Summary judgment is GRANTED to all defendants with respect to the failure to intervene claim brought pursuant to 42 U.S.C. § 1983;

- Summary judgment is DENIED in all other respects.

---

[295] *Cf. Casciola v. F.S. Air Serv., Inc.*, 120 P.3d 1059, 1062 (Alaska 2005) ("We do not consider arguments that are inadequately briefed." (citing *Lewis v. State*, 469 P.2d 689, 692 n.2 (Alaska 1970))).

[296] 739 P.2d 150 (Alaska 1987); *see also Maness v. Daily*, 307 P.3d 894, 903–06 (Alaska 2013).

Case No. 4:19-cv-00038-SLG, *Eyre v. The City of Fairbanks, et al.*
Order re Motion for Summary Judgment
Page 60 of 61

Case 4:19-cv-00038-SLG   Document 95   Filed 02/23/23   Page 60 of 61

DATED this 23rd day of February, 2023, at Anchorage, Alaska.

/s/ Sharon L. Gleason
UNITED STATES DISTRICT JUDGE

Case No. 4:19-cv-00038-SLG, *Eyre v. The City of Fairbanks, et al.*
Order re Motion for Summary Judgment
Page 61 of 61

Case 4:19-cv-00038-SLG   Document 95   Filed 02/23/23   Page 61 of 61